

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 23, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **FRESH ACQUISITIONS, LLC,** *et al.* | **Case No. 21-30721-sgj-11** |
| | **(Jointly Administered)** |
| **Post-Confirmation/Liquidating Debtors.** | |
| **DAVID GONZALES, TRUSTEE OF THE FRESH ACQUISITIONS LIQUIDATING TRUST** | |
| **Plaintiff.** | **Adv. No. 23-03056-sgj** |
| v. | |
| **AB REAL ESTATE, LLC** | **Civ. Act. No. 3:22-cv-2659-M** |
| **Defendant.** | |

**MEMORANDUM OPINION AND ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S CONSPIRACY TO COMMIT FRAUDULENT TRANSFER CLAIM**

1

I.    **INTRODUCTION**

The above-referenced post-confirmation adversary proceeding ("Adversary Proceeding") pertains to the bankruptcy cases of Fresh Acquisitions, LLC and fourteen related entities[1] (collectively, the "Debtors"). The Debtors were in the restaurant business, mostly operating under the names "Furr's," "Ryan's," "Old Country Buffet," and "Tahoe Joe's." The Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on April 20, 2021 (the "Petition Date"). This was not the first foray into bankruptcy for most of these Debtors. These Debtors and affiliates had filed Chapter 11 bankruptcy cases three separate times before (2008, 2012, and 2016). The 2016 Bankruptcy Case (herein so called)[2] has some relevance to this Adversary Proceeding, as will be later discussed. The Debtors' most recently-filed cases were administratively consolidated and, ultimately, substantively consolidated (the "2021 Bankruptcy Case").

The Debtors' organizational structure was broad and complex. There was more to the enterprise than simply the fifteen entities that filed Chapter 11. The following people controlled and majority-owned each of the Debtors:

> Allen Jones ("Jones"),
> Jason Kemp ("Kemp"),
> Larry Harris ("Harris").

(Jones, Kemp, and Harris, collectively, the "Owners").

---

[1] The 14 related entities which were also debtors along with Fresh Acquisitions, LLC were: Alamo Fresh Payroll, LLC; Alamo Ovation, LLC; Buffets LLC; Hometown Buffet, Inc.; Tahoe Joe's Inc.; OCB Restaurant Company, LLC; OCB Purchasing Co.; Ryan's Restaurant Group, LLC; Fire Mountain Restaurants, LLC; Food Management Partners, Inc.; FMP SA Management Group, LLC; FMP-Fresh Payroll, LLC; FMP-Ovation Payroll, LLC; and Alamo Buffets Payroll, LLC.

[2] To be precise, seven of the 14 Debtors in the current bankruptcy case were also debtors in the 2016 Bankruptcy Case and are implicated in this Adversary Proceeding.

The Owners mostly exercised their ownership and control indirectly—through personal operating companies and various management companies. Suffice it to say, there were layers upon layers of companies in the Fresh Acquisitions organizational structure.

An Official Committee of Unsecured Creditors ("UCC") in the 2021 Bankruptcy Case proposed a *First Amended Joint Chapter 11 Plan of Liquidation* (the "Plan") for the Debtors.  The Plan was confirmed by the Bankruptcy Court in its *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming The Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* (the "Confirmation Order"), entered on December 20, 2021.  Pursuant to the Plan, a trust known as the Fresh Acquisitions Liquidating Trust (the "Liquidating Trust") was created, and David Gonzales, the plaintiff herein, was appointed as its trustee (the "Trustee" or "Plaintiff").  In accordance with the terms of the Plan, the Confirmation Order, and the Fresh Acquisitions Liquidating Trust Agreement, numerous "Causes of Action" of the Debtors were vested in the Liquidating Trust, and the Trustee was granted standing to prosecute the Causes of Action.  More generally, all the Debtors' assets, as defined in section 541 of the Bankruptcy Code, were transferred to and vested in the Trust.  On the effective date of the Plan, the holders of general unsecured claims against any of the Debtors received a pro-rata beneficial interest in the Liquidating Trust "in full and final satisfaction" of their claims.

This Adversary Proceeding seeks to avoid a transfer of real property made by one of the Debtors known as Fire Mountain Restaurants, LLC ("Debtor Fire Mountain") that allegedly occurred for little or no consideration in return ("Transfer").  This Transfer occurred approximately two-and-a-half years before the Petition Date (i.e., in December 2018).  The Transfer was to a newly formed entity called AB Real Estate LLC ("ABRE" or "Defendant").  The property subject to the Transfer was located in the state of Tennessee. The Plaintiff argues that the Transfer either was

made with actual intent to defraud creditors or was a constructively fraudulent transfer, utilizing section 544 of the Bankruptcy Code and state fraudulent transfer laws.[3] The Plaintiff also tags on a cause of action for "conspiracy" to commit a fraudulent transfer.

The complaint that governs this Adversary Proceeding is Plaintiff's *Verified Second Amended Complaint* ("Live Complaint").[4] This Adversary Proceeding happens to be one of three involving allegedly fraudulent transfers of real property to Defendant ABRE (the "Three ABRE Adversary Proceedings"): Adversary Proceeding Nos. 23-03054, 23-03055, and 23-03056. Two of the Three ABRE Adversary Proceedings (including this one) involve transfers made by the Debtor Fire Mountain. The third of the Three ABRE Adversary Proceedings involves a transfer made by a different Debtor known as OCB Restaurant Company, LLC ("Debtor OCB Restaurant"). The Plaintiff sometimes refers to the allegations set forth in the Three ABRE Adversary Proceedings as the "ABRE Scheme."

In each of the Three ABRE Adversary Proceedings, both Plaintiff and Defendant have filed cross-motions for summary judgment regarding the fraudulent transfer causes of action. Defendant also seeks a summary judgment regarding Plaintiff's conspiracy to commit fraudulent transfer cause of action. As to the cross-motions on the fraudulent transfer claims, the court concludes that ***neither*** Plaintiff nor Defendant is entitled to a summary judgment under Rule 56 of the Federal Rules of

---

[3] Because the Transfer occurred more than two years prior to the Petition Date, the Plaintiff does not have a fraudulent transfer cause of action arising under § 548 of the Bankruptcy Code, which provides for a two-year look-back period; the Plaintiff relies here on the more generous look-back period of four years for avoiding fraudulent transfers under Texas law. Tex. Bus. & Com. Code §§ 24.001, *et seq.* (TUFTA).

[4] Dkt. No. 1. Note that the claims against ABRE in this Adversary Proceeding were originally brought in an earlier-filed adversary proceeding (Adv. Proc. No. 22-3087—hereinafter, the "Original Adversary Proceeding") in which the Plaintiff had named numerous defendants, including the Owners and related entities (including ABRE), for fraudulent transfers and several other causes of action. The over-arching theme of the Original Adversary Proceeding was that all defendants and claims asserted therein were collectively part of an overall fraudulent scheme perpetrated by the Owners. The bankruptcy court ultimately ordered that the Original Adversary Proceeding be severed into seven different adversary proceedings, in response to arguments by multiple defendants that Plaintiff was engaging in improper "group pleading" (in other words, there were broad allegations against the general group of defendants in the Original Adversary Proceeding without giving clear notice regarding which allegations and claims were being asserted against whom).

Civil Procedure because there are genuine issues of material fact on various elements of these causes of action. But with regard to the conspiracy to commit fraudulent transfer claim, this court concludes that Defendant is entitled to summary judgment as a matter of law, as this cause of action is duplicative or redundant of the fraudulent transfer claims. The court's reasoning pursuant to Rule 56 is set forth below.

## II.    PROCEDURAL HISTORY

The Live Complaint was filed on July 6, 2023 (after the bankruptcy court ordered severance of the claims herein from the much broader claims asserted against numerous defendants in Adv. Proc. No. 22-3087—defined herein as the "Original Adversary Proceeding" in footnote 4). The Transfer that the Trustee seeks to avoid herein occurred on December 10, 2018, and pertained to a property (formerly operating as a Ryan's Restaurant) located at 1225 W. Reelfoot Avenue, Union City, Tennessee (the "Reelfoot Tennessee Property"). As noted above, now pending are cross-motions for summary judgment,[5] responses,[6] replies,[7] and dense appendices.[8] Defendant ABRE argues that it is entitled to a summary judgment with respect to *all* of the Trustee's claims in the

---

[5] *See* Defendant AB Real Estate, LLC's Motion for Summary Judgment. Dkt. No. 78. *See also* Defendant AB Real Estate, LLC's Memorandum in Support of Motion for Summary Judgment ("ABRE's MSJ Brief"). Dkt. No. 79. *See also* Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment. Dkt. Nos. 77.

[6] *See* Response to ABRE's Motion for Summary Judgment ("Trustee's Response") and Defendant AB Real Estate, LLC's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment ("ABRE's Response"). Dkt. Nos. 89 and 92, respectively.

[7] *See* Defendant AB Real Estate, LLC's Reply in Support of Motion for Summary Judgment ("ABRE's Reply"). Dkt. No. 97. *See also* Reply in Support of Motion for Partial Summary Judgment ("Trustee's Reply"). Dkt. No. 99.

[8] *See* Appendix in Support of Defendant AB Real Estate, LLC's Motion for Summary Judgment and Memorandum in Support. Dkt. Nos. 79-1 through 79-9. Citations to ABRE's appendix shall be in the format of "ABRE App'x [page #(s)]." *See also* Plaintiff's Motion for Partial Summary Judgment with appendix. Dkt. No. 77-2 through 77-4. Citations to the Trustee's appendix in support of his Motion for Partial Summary Judgment shall be in the format of "Trustee App'x [page #(s)]." The Trustee and ABRE each filed a separate appendix in support of their Responses. Dkt. Nos. 90 and 93-1 to 93-14, respectively. Citations to the Response appendices shall be in the format of "Trustee Resp. App'x [page #(s)]" and "ABRE Resp. App'x [page #(s)]."

Live Complaint. The Trustee seeks partial summary judgment—i.e., summary judgment on his fraudulent transfer claims, but not on his ***conspiracy*** to commit fraudulent transfer claims.

The court scheduled oral arguments on the cross motions for summary judgment for February 12, 2025. It soon became apparent that there was no meeting of the minds or clear answer regarding what choice of law should be applied in the Adversary Proceeding. The bankruptcy court sits in Texas but the real property transferred is situated in Tennessee. In his Live Complaint, the Trustee stated that he was bringing his fraudulent transfer claims under "either the law of Texas or Tennessee, likely dependent on a conflict of law analysis" but failed to identify the appropriate conflict of law analysis to be applied or take a position. Live Complaint, ¶ 93. Then in his motion for summary judgment, he suggested that the fraudulent transfer laws of Tennessee applied, and not the laws of Texas, even though the Trustee acknowledged that both states apply the Uniform Fraudulent Transfer Act.[9] Nevertheless, the Trustee argued that he was entitled to summary judgment on his fraudulent transfer claims under either state's laws. ABRE argued, on the other hand, that, under the appropriate choice of law analysis, the laws of Texas apply to the Trustee's claims.

The court required supplemental briefing on choice of law. In the subsequent briefing,[10] the parties agreed that the court should apply Texas choice-of-law rules (because the court sits in Texas), with the Trustee conceding that, under Texas' choice of law rules, the law of Texas applies to his fraudulent transfer claims in this Adversary Proceeding.[11] There is support in this District for a court

---

[9] Texas' version of the Uniform Fraudulent Transfer Act ("TUFTA") is contained in Tex. Bus. & Com. Code §§ 24.001, *et seq.*

[10] *See* Defendant AB Real Estate, LLC's Supplemental Brief on Summary Judgment Issues ("ABRE's Supplemental Brief") and Trustee's Supplemental Brief filed on March 10, 2015. Dkt. Nos. 120 and 121, respectively.

[11] *See* Trustee's Supplemental Brief, 1-2.

accepting the parties' stipulation regarding the applicability of Texas law.[12]  Moreover, the court

agrees with the parties' choice-of-law analysis in their supplemental briefs, so it will apply Texas

law to the Trustee's claims.[13]

## III.    UNDISPUTED FACTS

The Trustee and ABRE do not dispute the following basic facts.

Debtor Fire Mountain was an Ohio limited liability company.

Jones, Kemp, and Harris (i.e., the Owners) collectively controlled, and were indirect

majority owners of, each of the Debtors (including Debtor Fire Mountain) through personal

operating companies and various management companies.

ABRE, a Texas limited liability company, is the Defendant herein and was formed on

November 28, 2018—just two weeks before the Transfer that is the subject to this Adversary

Proceeding. ABRE's Limited Liability Company Agreement is dated November 28, 2018.[14]

Although ABRE itself is not a Debtor herein, it—at all times since its formation—has had the

---

[12] *See, e.g., DeWolff, Boberg & Associates, Inc. v. Clark*, No. 3:22-CV-2489-K, 2023 WL 5437665, at *3 (N.D. Tex. Aug. 23, 2023) (applying Texas law where "[t]he parties timely filed a joint Stipulation Regarding Choice of Law in which they 'stipulate that no conflict exists between Delaware and Texas law on the issue of enforceability of the underlying restrictive covenants and that Texas law applies to the contract claim.").

[13] *See Vida v. T.W. Doers Investment Firm, Inc. (In re Benitez)*, No. 21-40734-ELM, 2023 WL 6395906, at *6 (Bankr. N.D. Tex. Oct. 2, 2023), *aff'd and adopted sub nom. Vida v. Crawford*, No. 4:22-CV-0620-P, 2023 WL 7921146 (N.D. Tex. Nov. 16, 2023) (applying Texas fraudulent transfer statutes, embodied in TUFTA, in an adversary proceeding involving an alleged fraudulent transfer of Georgia real property); *see also Janvey v. Brown*, 767 F.3d 430, 434 (5th Cir. 2014) (choice of law issues for fraudulent transfer claims are generally governed by the forum state in which the bankruptcy court is sitting); *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009) ("It is well-settled that choice of law issues for supplemental state law claims, such as the fraudulent transfer claims at issue here, are governed by the forum state in which the federal court is sitting. Here, the forum state is Texas, and 'Texas courts follow the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws[.]'") (citing *Janvey v. Brown,* 767 F.3d at 434). The Trustee acknowledged as well that the court need not conduct a "most significant relationship" analysis for the Reelfoot Tennessee Property because there is no conflict between Texas' and Tennessee's versions of the Uniform Fraudulent Transfer Act, which have "identical language in their fraudulent transfer laws." Trustee's Supplemental Brief, 2 (citing *Benitez*, 2023 WL 6395906, at *6 (where the bankruptcy court found that the two states' laws (Georgia's and Texas') were "substantially identical" and, thus, it was not necessary for the court to conduct the "most significant relationship" analysis). The court agrees with the parties' ultimate assessment that there is no actual conflict between Tennessee's fraudulent transfer laws and TUFTA, so TUFTA applies to the Trustee's fraudulent transfer claims here.

[14] Trustee App'x 1-4.

Owners as its managers and indirect majority owners.  This ownership was through entities known as Larrac, LLC (owned and controlled by Harris), All Jones, LLC (owned and controlled by Jones), and Dayspring Operating Company, LLC (owned and controlled by Kemp).[15] These all have the same address at 120 Chula Vista, Hollywood Park, Texas (an address that the Debtors have all used as well).

Less than two weeks after ABRE was formed, it received three transfers of three different real properties (in three different states) for no stated consideration.  Those three transfers are the subject of the Three ABRE Adversary Proceedings.

The Reelfoot Tennessee Property Transfer (the Transfer at issue in this Adversary Proceeding) occurred on December 10, 2018, when the Debtor Fire Mountain transferred the Reelfoot Tennessee Property (a shuttered "Ryan's" restaurant property) to the newly-formed ABRE via a quitclaim deed[16] that reflected the payment of "the sum of one dollar ($1.00) and other valuable considerations." An individual named Peter Donbavand ("Donbavand") executed the quitclaim deed on behalf of Debtor Fire Mountain as its "Vice President of Real Estate"[17] Donbavand also executed an "Acknowledgement" that was attached to the Reelfoot Tennessee Property quitclaim deed that stated in all caps, "THE ACTUAL CONSIDERATION FOR THIS TRANSFER IS $0.00."[18]

The second of the three transfers occurred on December 7, 2018, when Debtor Fire Mountain transferred to the newly-formed ABRE another closed restaurant property—this one being a property located at 204 Highway 28 Bypass, Anderson, South Carolina (the "Highway 28

---

[15] Larrac, LLC, All Jones, LLC, and Dayspring Operating Company, LLC each own 21.84% of ABRE. Another company called BPTX Holdings, LLC, owned by an individual named Brian Padilla, also owns or owned a 21.84% ownership interest in ABRE.

[16] *See* Trustee App'x 275-77.

[17] *See* Trustee App'x 276.

[18] Trustee App'x 278.

South Carolina Property")—via quitclaim deed[19] that reflected the payment of "the sum of one dollar ($1.00) and other valuable considerations."[20] Once again, an individual named Donbavand executed the quitclaim deed on behalf of Debtor Fire Mountain as its "Vice President of Real Estate."[21] In connection therewith, Donbavand also executed an affidavit claiming an exemption from the deed recording fee because the quitclaim deed was a deed[22]

> (8) transferring realty to a corporation, a partnership, or a trust in order to become, or as, a stockholder, partner, or trust beneficiary of the entity provided no consideration is paid for the transfer other than stock in the corporation, interest in the partnership, beneficiary interest in the trust, or the increase in value in such stock or interest held by the grantor. However, the transfer of realty from a corporation, a partnership, or a trust to a stockholder, partner, or trust beneficiary of the entity is subject to the fee even if the realty is transferred to another corporation, a partnership, or trust.

The third relevant real property transfer occurred on the same date as the Highway 28 South Carolina Property transfer—December 7, 2018—when Debtor OCB Restaurant transferred via a quitclaim deed[23] to the newly-formed ABRE certain real property located at 1915 E. 29th Street, Marshfield, Wisconsin (the "29th Street Wisconsin Property"). The 29th Street Wisconsin Property, along with the Highway 28 South Carolina Property and the Reelfoot Tennessee Property, will hereinafter be referred to as the "Three ABRE Properties").[24] The 29th Street Wisconsin Property was a larger, industrial warehouse property, sometimes referred to as a millworks facility (not a restaurant).[25] Based on the face of the quitclaim deed, ABRE did not pay to Debtor OCB Restaurant

---

[19] *See* Trustee App'x 818-823.

[20] The Trustee seeks to avoid the transfer by Debtor Fire Mountain of the Highway 28 South Carolina Property in a separate adversary proceeding, Adv. Pro. No. 23-3054.

[21] *See* Trustee App'x 819.

[22] *See* Trustee App'x 821, 823.

[23] *See* Trustee App'x 764.

[24] The Trustee seeks to avoid the transfer by Debtor OCB Restaurant of the 29th Street Wisconsin Property in yet a third adversary proceeding relating to transfers of the Three ABRE Properties, Adv. Pro. No. 23-3055.

[25] ABRE App'x 1316; Trustee App'x 654-660.

or any other Debtor cash consideration for the 29th Street Wisconsin Property. Also, notably, it appears from the summary judgment record that this quitclaim deed from OCB Restaurant to ABRE was not recorded at the time of its December 7, 2018 conveyance (which apparently was only discovered in early 2020 when ABRE reached an agreement to sell it; the quitclaim deed from Debtor OCB Restaurant to ABRE was belatedly recorded in January 22, 2020).[26] Once again, the individual named Donbavand executed the quitclaim deed on behalf of Debtor OCB Restaurant as its "Vice President of Real Estate."

The following fact is ***highly relevant*** to the Trustee's fraudulent transfer claims:  Each of the Three ABRE Properties (including the Reelfoot Tennessee Property that is the subject of this Adversary Proceeding), at the time they were transferred in December 2018, were apparently subject to liens in favor of an entity called META Advisors, LLC ("META"), which liens secured a promissory note dated May 18, 2017, in the original amount of $5,250,000 ("META Note").[27] There were actually ***seven Debtor entities*** that were makers on the META Note, ***including Debtors Fire Mountain and OCB Restaurant, all of whom were jointly and severally liable on the note***.[28] All seven makers on the META Note pledged all of their assets as collateral for the META Note, pursuant to a Security Agreement (which is un-dated, shown as May __, 2017, in the summary judgment record), apparently giving META a blanket lien on all of the seven Debtors' assets.[29] Specifically, the Security Agreement stated that META was receiving a security interest in all assets of the makers, including:  Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts,

---

[26] ABRE App'x 1350; Trustee App'x 764; 812-13; ABRE Resp. App'x 70; 148 (A. Wang Dep. Tr. 27:10-20); ABRE Resp. App'x 228; 237.

[27] *See* Trustee Resp. App'x 5-20.

[28] The five other Debtors obligated on the META Note were Buffets, LLC, Hometown Buffet, Inc., OCB Purchasing Co., Ryan's Restaurant Group, LLC, and Tahoe Joe's, Inc.

[29] *See* Trustee Resp. App'x 5 (page 1 of the META Note); Trustee Resp. App'x 59-87 ("Security Agreement May __, 2017 between Each of the Grantors Party Hereto and META Advisors, LLC, as Trustee").

Documents, General Intangibles, Goods, including Equipment and Fixtures, Instruments, Inventory,

Investment Property, Letters of Credit and rights pursuant thereto, Money, all rights under Leases

(a schedule of leases listed several dozen), all Accessions and Supporting Obligations, and "all other

interests in real property . . . ."[30] ***The court could not find a recorded copy of the Security***

***Agreement nor actual recorded mortgages/deeds of trust in the summary judgment evidence for***

***the Three ABRE Properties*** (all the lawyers on both sides of this Adversary Proceeding apparently

do not think that is an issue, since none of them mentioned this—although from a legal standpoint

under TUFTA, it is certainly an issue, as will be later discussed).[31]  In any event, the META Note

included a schedule of principal and interest payments that provided for the payment of eight

quarterly payments of the principal amount of $656,250.00, commencing with the payment of

$728,437.50 on August 1, 2017, and ending with the payment of $665,273.44 on May 1, 2019 (at

which point the note would be paid in full).[32]  Interestingly (as with the Trustee/Plaintiff herein)

***META was a trustee of a creditor trust created under a Chapter 11 plan that was confirmed a***

***short time before—on April 27, 2017—in connection with the Debtors' 2016 Bankruptcy Case***.[33]

To be clear, the Three ABRE Properties (including the Reelfoot Tennessee Property) were

apparently pledged as collateral for a promissory note owed to META that was for the original

principal amount of $5,250,000, and Debtors Fire Mountain and OCB Restaurant were among the

seven makers on the META Note, but the newly-created ABRE was not. Also, perhaps relevant, is

that all Debtors in the 2016 Bankruptcy Case (including Fire Mountain and OCB Restaurant) were

---

[30] *See* Trustee Resp. App'x 63-64.

[31] *See* ABRE App'x 196-268 (which are ***unrecorded*** copies of the purported deeds of trust/mortgages from Fire
Mountain and OCB Restaurant to META). *See also* ABRE Resp. App'x 334-437. *See also* TUFTA § 24.002(13)
("'Valid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or
equitable process or proceedings.").

[32] *See* META Note, Schedule A – Principal and Interest Payments, Trustee Resp. App'x 20.

[33] As earlier noted, the Debtors and various entities with common ownership as the Debtors previously filed for Chapter
11 bankruptcy four times:  in 2008, in 2012, and in 2016. Trustee App'x 332.

substantively consolidated for purposes of the plan ultimately confirmed in that case.[34]    The

summary judgment evidence suggests that, at the time of the transfers of the Three ABRE Properties,

the balance due under the Meta Note was $1,312,500.[35] The parties do not agree on the value of the

Reelfoot Tennessee Property or of META's other collateral owned by Debtor Fire Mountain or the

other six Debtor-makers,[36] and both parties challenge the other party's summary judgment evidence

on the valuation issue.[37]

---

[34] ABRE App'x 300.

[35] The Trustee points to eight quarterly Post-Confirmation Reports filed by the reorganized debtors in the 2016 Bankruptcy Case (Bankruptcy Case 16-50557), indicating disbursements made during each quarter to the "Unsecured Creditors Trust" of amounts equal to the quarterly payments due under Schedule A (schedule of principal and interest payments) of the META Note. *See* Trustee Resp. App'x 27, 31, 35, 39, 43, 47, 51, and 55 (respectively, of the Post-Confirmation quarterly reports for the quarters beginning with the 3rd Quarter 2017 and ending with the 2nd Quarter 2019). Trustee Resp. App'x 21-56. According to the schedule of payments, after the disbursement made in the 4th Quarter 2018 (recall that the Transfers occurred on December 7, 2018 and December 10, 2018), the principal balance due under the META Note, assuming the payment was timely made on November 1, 2018 according to the schedule of payments, would have been $1,312,500 at the time of the ABRE Transfers. *See also* Trustee's Response, 16 ("The balance of the Meta Debt, at the time of the ABRE Transfers, was not $5.25 million. Rather, it was, at most, approximately $1.3 million . . . ."; Trustee's Supplemental Brief, 21 ("[T]he issue for analysis is whether the Property transfers had value in a fraudulent conveyance context given a $1,312,300 lien.").

[36] The Trustee points, in paragraph 8 of his Response, to "retroactive" appraisal reports that he submitted as part of the summary judgment evidence that supports valuations, as of the dates of the respective transfers from Debtor Fire Mountain of the Highway 28 South Carolina Property at $323,000 and of the Reelfoot Tennessee Property at $1,000,000 and from Debtor OCB Restaurant of the 29th Street Wisconsin Property at $1,545,000. In addition, the Trustee points to a 4.719-acre real property located in Rocky Mount, North Carolina that was owned by Debtor Fire Mountain, 2.5 acres of which were sold during the 2021 Bankruptcy Case for $100,000. *See* Trustee's Response, 7, ¶ 8(e) (citing this court's *Order (I) Approving the Private Sale of Real Property in Nash County, North Carolina, Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to 11 U.S.C. § 363, and (II) Granting Related Relief*, Bankr. Dkt. No. 585). The Trustee also points to evidence of META collateral consisting of Debtor OCB Restaurant's interest in the non-realty contents of the 29th Street Wisconsin Property that were sold at auction for gross proceeds of over $208,000 and net proceeds of over $175,000. Finally, the Trustee points to "[a]ll other assets of the six [sic] Debtors liable on the [META] Note, including Tahoe Joe's . . . . Although the complete value of these assets has not been determined, Debtor assets that were sold for $4,212,000 to BBQ Growth, LLC during the 2021 Bankruptcy Case belonged primarily or exclusively to Tahoe Joe's" who was a maker on the META Note. Trustee's Response, 7-8, ¶ 8(f) (citing this court's *Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens and Liabilities, (B) Authorizing the Debtors to Assume and Assign Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Related Relief*, Bankr. Dkt. No. 474).

[37] The Trustee claims his evidence of valuation of at least some of the collateral that secured the META Note is "unrebutted." ABRE disagrees and offers the valuation testimony of three different real estate agents/brokers who were involved in the marketing of the Three ABRE Properties, as well as deposition testimony of ABRE's Rule 30(b)(6) witness, Harris—all of which it argues establishes a substantially lower valuation, at least as to the Three ABRE Properties, than the Trustee's. *See* ABRE Response, 12; Steven Harbison Dep. Tr. 35:23-36:25, 29:23-30:3, 48:14-49:9, ABRE Resp. App'x 1065-66, 1059-60, 1078-79; Dean Larsen Dep. Tr. 36:21-37:11, 41:3-10, ABRE Resp. App'x 1185-87; Darron Meares Dep. Tr. 45:10-21, 50:14-21, 54:1-5, ABRE Resp. App'x 1253, 1256-57. Each of the brokers also testified about his concerns with, and criticism of, the Trustee's appraisals based on each brokers' expertise in each

On March 26, 2019 (approximately three months after its transfer to ABRE), ABRE sold the Reelfoot Tennessee Property to a company called Q-Lin Properties, LLC for $520,000. Net proceeds of $476,188.18 from the sale of the Reelfoot Tennessee Property were transmitted directly to the lienholder META.[38] It appears that shortly thereafter (in the second quarter of 2019), the small remaining amount on the META Note was paid off in full.[39]  In any event, ABRE did not receive any proceeds from the sale of the Reelfoot Tennessee Property—neither did the Debtor Fire Mountain, for that matter.

The Highway 28 South Carolina Property was ultimately sold at a tax auction (foreclosure sale) to a company called Powdersville Holdings LLC for a mere $90,000, more than three years after the Transfer to ABRE (on February 28, 2022).[40] ABRE did not receive any proceeds from the sale of the Highway 28 South Carolina Property—neither did the Debtor Fire Mountain, for that matter (all sale proceeds went to Anderson County, South Carolina—a taxing authority that was owed taxes associated with the property and conducted the tax auction).[41]

On February 25, 2020 (approximately 15 months after OCB Restaurant purportedly transferred to ABRE the 29th Street Wisconsin Property), ABRE sold it to an entity called Counter-

---

property's geographical region. *Id.*; Harbison Dep. Tr. 15:22-16:2, 29:23-30:3, 32:19-35:22, 48:14-49:9, ABRE Resp. App'x 1046-47, 1059-60, 1062-65, 1078-79; Larsen Dep. Tr. 16:12-21, 42:19-43:20, ABRE Resp. App'x 1168, 1188-89; Meares Dep. Tr. 18:4-16, 50:14-21, 54:1-5, 55:20-57:11, ABRE Resp. App'x 1237, 1256-60. ABRE pointed to evidence of valuation of at least the Reelfoot Tennessee Property and the Highway 28 South Carolina Property that were listed for sale at or near the time of the transfers, and neither sold for the listing price at that time. *Id.* at 13; Harbison Dep. Tr. 21:12-18, ABRE Resp. App'x 1051, 1058 (regarding the listing of the Reelfoot Tennessee Property); ABRE Resp. App'x 1822-25, 1827-31 (emails referencing listing of Highway 28 South Carolina Property and discussing retaining new brokers); ABRE Resp. App'x 1804-06 (Auction Listing Contract for Highway 28 South Carolina Property). ABRE pointed as well to the ultimate sales prices for the Reelfoot Tennessee Property and the 29th Street Wisconsin Property, which were sold to unrelated third parties in arms' length sales, as "strong evidence of the value of each respective property . . . sufficient to create genuine issues of material fact regarding the values." *See* ABRE Response, 13. The court will address the evidentiary objections below.

[38] Kemp Decl. ¶¶ 11-12 and Attachment 1, Reelfoot Closing Statement, ABRE App'x 752, 755-757.

[39] ABRE App'x 798.

[40] ABRE 30(b)(6) Dep. Tr. 20:4-6, 20:22-21:6, 118:1-119:8, 128:4-10, ABRE App'x 81-82, 106-107, 112.

[41] ABRE App'x 106.

Form, LLC for a purchase price of $925,000. Interestingly, the summary judgment evidence shows that, shortly before the closing on this sale, a title company discovered that the quitclaim deed from December 2018, purporting to convey this property from Debtor OCB Restaurant to ABRE was never recorded.[42] In any event, on February 28, 2020, ABRE received sale proceeds of approximately $838,000 from the sale of the 29th Street Wisconsin Property. ABRE did not transfer this $838,000 of proceeds to the Debtor OCB Restaurant. Instead, ABRE immediately transferred $838,000 to an entity called TXFMP Management, LLC ("TXFMP"), a non-debtor management entity affiliated with the Owners.[43] TXFMP managed numerous entities for the Owners, not all of which were Debtors.[44] The summary judgment evidence suggests that the META Note had been paid in full almost a year before this transaction.[45]

## IV.    SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 *mandates* the entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,"[46] because "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

---

[42] Trustee App'x 269-270.

[43] ABRE Bank Statement, ABRE Resp. App'x 112-13; TXFMP Bank Statement, ABRE Resp. App'x 115-24.

[44] Trustee App'x 16 (ABRE 30(b)(6) Dep. Tr. 33:12-13).

[45] *See supra* note 34 regarding the Post-Confirmation quarterly reports that indicate that the last payment on the META Note was made during the second quarter of 2019. Trustee Resp. App'x 55.

[46] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis in original)).

essential element of the nonmoving party's case necessarily renders all other facts immaterial."[47] A

fact is material "if the governing substantive law identifies it as having the potential to affect the

outcome of the suit."[48] A dispute as to a material fact is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."[49] "[A] party cannot defeat summary

judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."[50]

Rather, pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure,

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
>
> (A)    citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
>
> (B)    showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Under Rule 56, a movant "need not 'negate' the elements of the nonmovant's case,"[51] but rather

meets [his] initial burden of showing there is no genuine issue for trial by "point[ing] out the absence

of evidence supporting the nonmoving party's case."[52] "If the moving party carries his initial

burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine

---

[47] *Celotex*, 477 U.S. at 322-23.

[48] *Hutton Commc'ns, Inc. v. Commc'n Infrastructure Corp.*, 461 F.Supp.3d 400, 403 (N.D. Tex. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[49] *Id.* (citing *Anderson*, 477 U.S. at 248) (other citation omitted)).

[50] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotations omitted); *see also Kennedy v. Allstate Texas Lloyd's*, 2020 WL 8300511, at *1 (N.D. Tex. Dec. 14, 2020) ("Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial.") (citing *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

[51] *Little*, 37 F.3d at 1075.

[52] *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir.1990) (citing *Celotex*, 477 U.S. at 325).

issue of material fact."[53] "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim."[54] "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."[55] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"[56]

When evaluating a motion for summary judgment, the court views the facts "in the light most favorable to the nonmoving party" but "only if there is a 'genuine' dispute as to those facts."[57] "[I]t is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact."[58] Rather, "[t]he nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts."[59]

Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant."[60] If the nonmoving party fails to

---

[53] *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.").

[54] *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted)); see also *Little*, 37 F.3d at 1075 ("[T]he nonmovant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.").

[55] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[56] *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)).

[57] *Scott v. Harris*, 550 U.S. at 380; *see also Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018) ("The court considers the record as a whole, and draws all justifiable inferences in favor of the non-movant[, b]ut the non-movant bears 'the burden of demonstrating by competent summary judgment proof that there is [a genuine dispute] of material fact warranting trial.'")(internal citations omitted).

[58] *Hutton Commc'ns*, 461 F.Supp.3d at 403 (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)).

[59] *Id.* (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

[60] *Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury."); see also, *Anderson*, 477 U.S. at 251-252, 106 S.Ct. at 2512 (where the Court

meet his burden of submitting competent summary judgment evidence that there is a genuine dispute

as to a material fact, "the motion for summary judgment must be granted."[61]

## V.    LEGAL ANALYSIS

### A.  "Standing" Objection

ABRE, in its Response to the Trustee's Motion for Partial Summary Judgment, raises for the

first time the issue of the Trustee's alleged lack of standing, under Bankruptcy Code § 544(b) and

TUFTA, to bring fraudulent transfer claims against ABRE—noting that the Trustee's standing

would have to be derivative of an actual unsecured creditor's right under TUFTA. ABRE argues

that the Trustee has not even alleged in the Live Complaint, much less pointed to evidence in the

summary judgment record, that an actual unsecured creditor existed as of the Petition Date who

would have had standing under TUFTA to avoid the Transfer of the Reelfoot Tennessee Property.

The standing issue must be addressed first, since it is a threshold issue pertaining to whether the

court even has the fundamental power to hear the suit.[62] The Trustee, in his Reply to ABRE's

Response, does not refute the alleged lack of standing by pointing to specific evidence in the

summary judgment record.  Rather, he states that his standing here "is clear" and not lacking.[63] The

Trustee claims that "*all* of the creditors on the claims register for Fire Mountain (Bankruptcy Case

No. 21-30729-sgj11) provide the Trustee standing at least as to the . . . Reelfoot and Highway 28

transfers" and that because the Debtors' estates were substantively consolidated, "arguably <u>any</u>

---

stated that the inquiry under a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

[61] *Little*, 37 F.3d at 1076 (emphasis added) ("A plaintiff should not be required to wait indefinitely for a trial when the defendant has a meritless defense that can be resolved on motion for summary judgment.").

[62] ABRE's Response, 21 ("[T]he Trustee's standing to avoid transfers is derivative of an actual creditor's right and 'is a threshold issue that must be addressed first, because it determines the court's fundamental power even to hear the suit.'") (citing *In re Heritage Org., LLC*, No. 04-35574-BJH-11, 2008 WL 5215688, at *3 (Bankr. N.D. Tex. Dec. 12, 2008) (internal citations omitted)).

[63] Trustee's Reply, 7.

creditor of <u>any</u> Debtor  (not just [the] transferring Debtor[ ] . . .) is a triggering creditor providing standing for the claims against ABRE."[64]

Section 544(b) of the Bankruptcy Code allows a trustee to "avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding an unsecured claim."[65] The United States Supreme Court recently highlighted the "notabl[e]" requirement that "to show that a transfer is 'voidable under applicable law,' a bankruptcy trustee must 'identify the actual creditor or creditors who could have set aside the transaction in question under applicable law.'"[66] The parties do not disagree with this legal standard; they disagree here on the issue of whether the Trustee has met his burden of identifying in the summary judgment record an actual creditor or creditors who could have avoided the Transfer under TUFTA. Nowhere does the Trustee in the Live Complaint specifically identify a particular unsecured creditor or creditors who could have avoided the Transfer under the actual or constructive fraud provisions of TUFTA, and he acknowledges as much in his Reply.  Rather, the Trustee states that his standing here is clear and not lacking because "*all* of the creditors on the claims register for [Debtor] Fire Mountain . . . provide the Trustee standing[,]" implying that the court may take judicial notice of Debtor Fire Mountain's claims register in its bankruptcy case. The court can, indeed, take judicial notice of the unsecured creditors listed on the claims register in determining the sufficiency of summary judgment evidence to support the Trustee's claims. The claims register for Debtor Fire Mountain reflects five proofs of claim filed against it, at least some of which reflect amounts owing for time periods before the Transfer (*e.g.,* Claim No. 1-1 of the Georgia Department of Revenue for a 2007; Claim No. 4-3,

---

[64] *Id.*  To the extent substantive consolidation is applied, this court notes that more than 500 proofs of claim were filed against the Debtors in these consolidated bankruptcy proceedings, totaling more than $700 million in claims. Trustee App'x 350.

[65] Bankruptcy Code § 544(b)(1).

[66] *United States v. Miller*, 604 U.S. ___ , 145 S.Ct. 839, 847, 2025 WL 906502 *4 (March 26, 2025) (quoting 5 Collier, Bankruptcy ¶544.06[1], at 544–25).

Amended Claim of the Internal Revenue Service ("IRS") for 2015-2021 time periods). To be clear, the Trustee has the burden of identifying an actual creditor that would have had standing to avoid the Transfer under TUFTA. To do so, he must not only show that an unsecured creditor existed as of the Petition Date, but also that such unsecured creditor is a creditor whose "claim arose before or within a reasonable time after the transfer was made."[67] The court believes the Trustee has, at a minimum, created a genuine issue of material fact that would defeat summary judgment in favor of ABRE based on this issue—by pointing to the claims register for Debtor Fire Mountain. Moreover, ABRE has not pointed to any summary judgment evidence to refute the Trustee's standing, as supported by the claims register. Accordingly, ABRE is not entitled to summary judgment on the basis that the Trustee has no standing.

### B. Objections to Summary Judgment Evidence

#### 1. Trustee's Evidentiary Objections

The Trustee, in his Response, argues that the court should strike or disregard some of the summary judgment evidence proffered by ABRE in its appendix in support of its Motion for Summary Judgment. Specifically, the Trustee objects to the inclusion in the summary judgment record of (1) certain portions of the Declaration of Jason Kemp ("Kemp Declaration")[68] as (a) "sham affidavit" testimony contradicting prior deposition testimony and (b) self-serving statements unsupported by any documentary evidence; (2) certain portions of ABRE's expert Jason Rae's affidavit and the Rae Report for the reasons stated in a Motion to Exclude filed by the Trustee, which the court has already denied[69]; and (3) ABRE's evidence of valuation of the Three ABRE Properties

---

[67] TUFTA § 24.005(a).

[68] ABRE App'x, 749-88.

[69] ABRE includes as summary judgment evidence certain deposition testimony and an affidavit and report ("Rae Report") of its expert, Jason Rae ("Rae"). On October 25, 2024, the Trustee filed a motion to exclude a portion of the Rae Report and testimony of Jason Rae. *See* Motion to Exclude Portions of Report and Testimony of Jason Rae ("Trustee's Motion to Exclude"). Dkt. No. 75. The Trustee argued that the Rae Report is a rebuttal report (to the

through (a) the deposition testimony of three real estate agents/brokers who were involved with selling or attempting to sell each of the three real properties that are the subject of the ABRE fraudulent transfer actions, including the deposition testimony of Steven Harbison relating to the valuation of the Reelfoot Tennessee Property and (b) the deposition testimony of ABRE's Rule 30(b)(6) witness, Harris, based on Harris's experience in the restaurant industry and in commercial real estate because, the Trustee argues, these witnesses were not disclosed as expert witnesses prior to the expert disclosure deadline, and, therefore, their opinions are not competent summary judgment evidence and cannot create issues of fact.

<u>Objection to Kemp Declaration Testimony</u>

The Trustee seeks to strike certain "portions" of the Kemp Declaration as "an unsupported sham affidavit" and as "unsupported, self-serving declaration testimony."[70] The Trustee mentions that Kemp stated that proceeds of the sale of the 29th Street Wisconsin Property (and not of the sale of the Reelfoot Tennessee Property that is the subject of this Adversary Proceeding) were transferred to an entity known as TXFMP (a non-debtor management entity for the Debtors), to be used for the benefit of the Debtors generally, including for the payment of outstanding invoices and loans owed by the Debtors. This is alleged to have contradicted Kemp's earlier deposition testimony (as the Rule 30(b)(6) witness for TXFMP) that he "did not see" where those proceeds went and that he did not "know" whether the sale proceeds were transferred to any of the Debtors.[71] The Trustee argues that these "unexplained inconsistencies between the prior testimony not knowing where the funds

---

Trustee's experts' reports) into which ABRE is attempting to inject impermissible opinions. The Trustee argued that Rae is not a qualified appraiser and that his "unhelpful" opinions about the valuation of the Reelfoot Tennessee Property and about real estate transfers in general must be excluded. ABRE filed a response in opposition to the Trustee's Motion to Exclude on December 4, 2024, and the court held a hearing on January 29, 2025. Following the hearing, the court entered an order denying the Trustee's Motion to Exclude. *See Order Denying Trustee's Motion to Exclude*. Dkt. No. 116 (entered February 7, 2025).

[70] Trustee's Response, 11-12.

[71] Trustee's Response, 12 (citing TXFMP 30(b)(6) Dep. Tr., Vol. I, March 22, 2024, 246:21-247:12, Trustee's Response App'x, 242).

went, and the declaration testimony suddenly knowing where the funds went, is grounds for striking or not considering the statements in the Kemp Declaration."[72]

First, to the extent that the Trustee objects to "portions" of Kemp's Declaration testimony without detailing **which** portions he seeks to have stricken, his objections do not satisfy the requirements of Federal Rule of Evidence 103(a)(1) and, thus, his requests to strike those portions of Kemp's Declaration testimony under the "sham affidavit" rule (or otherwise) will be denied.[73]

Second, the court finds that the "sham affidavit rule" would not apply here to exclude any portion of Kemp's Declaration testimony. The "sham affidavit" rule is an exception to the general rule in the Fifth Circuit that, "[i]n considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition"—an "exception" in that the Fifth Circuit "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony"[74] but does allow a court to disregard "statements made in an affidavit that are 'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'"[75] The "sham affidavit" rule is based on "the proposition that a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment."[76] But, the Fifth Circuit has been careful to point out that "not every discrepancy in an affidavit justifies disregarding it when

---

[72] Trustee's Response, 13.

[73] *See Tucker v. SAS Inst., Inc.,* 462 F. Supp. 2d 715, 722 (N.D. Tex. 2006) ("Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken. Objections lacking specificity do not satisfy the requirements of Rule 103.") (internal citations omitted); *see also Coleman v. Bank of Am., N.A.,* No. 3:16-CV-1439-G, 2017 WL 3334104, at *3–4 (N.D. Tex. Aug. 4, 2017), aff'd, 720 F. App'x 724 (5th Cir. 2018) (denying motion to strike where party identified paragraphs at issue but was "unclear" regarding "which specific statements [he] believes should be stricken").

[74] *Seigler v. Wal-Mart Stores Texas, L.L.C.,* 30 F.4th 472, 477 (5th Cir. 2022) (citation omitted).

[75] *Rodriguez v. City of Corpus Christi,* 129 F.4th 890, 897 (5th Cir. 2025) (quoting *Winzer v. Kaufman County*, 916 F.3d 464, 472 (5th Cir. 2019) (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988))).

[76] *Seigler*, 30 F.4th at 477 (quoting *Doe ex rel. Doe v. Dallas Indep.. Sch. Dist.*, 220 F3d 380, 386 (5th Cir. 2000)).

evaluating summary judgment evidence."[77] "Instead, the bar for applying the doctrine is a high one, typically requiring affidavit testimony that is 'inherently inconsistent' with prior testimony."[78] "[T]he sham affidavit doctrine is inappropriate where an 'affidavit supplements, rather than contradicts' an earlier statement"[79] and is "not applicable when discrepancies between an affidavit and other testimony can be reconciled such that the statements are not inherently inconsistent."[80] Here, Kemp's Declaration testimony regarding the disposition of the sale proceeds of the 29th Street Wisconsin Property does not contradict, and is not "so markedly inconsistent" with, his earlier deposition testimony so as to "constitute an obvious sham." The testimony from Kemp (as TXFMP's corporate representative)—nearly five years after the distributions, and with no bank statements or other documentation provided to him—that he "did not see" and did not "know" where the sale proceeds of the 29th Street Wisconsin Property were transferred does not indicate that his declaration is a sham that should be excluded. It is entirely plausible that Kemp, **after** having had the opportunity to look at specific records (which were attached to his declaration), was able to supplement his earlier deposition testimony and testify with details and specifics of the transfers recorded therein when he had been unable to remember those details during his deposition, which took place nearly five years after the transfers occurred. It is unsurprising that any deponent would be unable to remember such specific financial information without reliance on records. Kemp's Declaration does not contradict, but supplements, his prior deposition testimony and is not so inherently inconsistent so as to be considered "an obvious sham." The "sham affidavit" doctrine simply is not applicable here, and so the court will not strike Kemp's Declaration testimony.

---

[77] *Id.* (quoting *Winzer*, 916 F.3d at 472).

[78] *Id.* (citations omitted).

[79] *Rodriguez*, 129 F.4th at 897 (quoting *Winzer*, 916 F.3d at 473 (quoting *Clark*, 854 F.2d at 766)).

[80] *Seigler*, 30 F.4th at 477 (citing *Winzer*, 916 F.3d at 472-73)

Third, the Trustee also suggests that Kemp's Declaration testimony regarding the disposition of the 29th Street Wisconsin Property sale proceeds should be excluded because it is an unsupported self-serving statement.[81] But, the court cannot disregard or exclude declaration testimony just because it is self-serving. This is because, while merely conclusory statements will not suffice to create genuine issues of material fact that would defeat summary judgment, "[a] non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, ***even if the affidavit is self-serving and uncorroborated***."[82] Here, Kemp's Declaration testimony is not unsupported or uncorroborated, and it is not merely "conclusory" statements that could or should be disregarded by the court under established summary judgment standards. To the contrary, Kemp's Declaration testimony is supported by documentary evidence attached to the Kemp Declaration, including specifically, ABRE and TXFMP bank statements that show the transfer of sale proceeds to TXFMP immediately following the sale and the contemporaneous receipt by TXFMP of those sale proceeds, as well as the substantially contemporaneous subsequent transfers made by TXFMP to ***some*** of the Debtors and their creditors.[83] The court concludes that Kemp's Declaration testimony is supported by facts and is not merely conclusory such that the court can and should consider, and not exclude, the evidence in connection with these cross motions for summary judgment.

---

[81] Trustee's Response, 13.

[82] *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (citing *United States v. Stein*, 881 F.3d 853, 859 (11th Cir. 2018) (en banc) ("[T]he self-serving and/or uncorroborated nature of an affidavit cannot prevent it from creating an issue of material fact.") (emphasis added); *see also C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) ("[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably selfserving."); *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 513 (5th Cir. 1999), *superseded by statute on other grounds, as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002) ("[M]erely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient. Much evidence is self-serving and, to an extent, conclusional.")). The Fifth Circuit notes, in support of this proposition, that "[t]he Supreme Court has been clear that at summary judgment 'the [court's] function is not . . . to weigh the evidence." *Lester*, 805 F. App'x at 291 n.2 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[83] *See* Kemp Declaration, Exhibits 4 and 5, ABRE App'x 775-777 and 778-788.

<u>Objection to Jason Rae Report and Testimony</u>

As noted above, following a hearing on January 29, 2025, on the Trustee's Motion to Exclude the Rae Report and Rae's testimony, the court entered an order denying the Trustee's request.[84] Thus, the court will consider the Rae Report and Rae's testimony as part of the summary judgment record.

<u>Objections to Testimony of Real Estate Brokers and Harris Regarding Value</u>

The Trustee objects to ABRE's attempt to include evidence of valuation of the Three ABRE Properties through (a) the deposition testimony of three real estate agents/brokers who were involved with selling or attempting to sell each of the Three ABRE Properties, including the deposition testimony of Steven Harbison relating to the valuation of the Reelfoot Tennessee Property, and (b) the deposition testimony of ABRE's Rule 30(b)(6) witness, Harris, based on Harris's experience in the restaurant industry and in commercial real estate.

The Trustee argues, for the first time, in his Reply in support of his own summary judgment motion, that the deposition testimony of the three brokers and Harris, offered by ABRE as "evidence of valuation," should be excluded from the summary judgment record because ABRE did not disclose any of them as expert witnesses prior to the expert disclosure deadline, and, therefore, their opinions are not competent summary judgment evidence and cannot create issues of fact. ABRE disagrees with the Trustee and argues that it timely disclosed all three brokers as experts in its Third Amended Disclosures.[85] The Trustee did not object to expert testimony of the three brokers or Harris in his earlier mentioned Motion to Exclude, which dealt only with the Rae Report.[86] The Trustee

---

[84] *See Order Denying Trustee's Motion to Exclude* (entered February 7, 2025). Dkt. No. 116.

[85] *See* ABRE's Response, 12 n.20 (citing ABRE's Third Amended Disclosures, 5, 7-8, ABRE Resp. App'x 1292-95; Harbison Dep. Tr., 11:13-18:7, ABRE Resp. App'x 1042-48; Larsen Dep. Tr., 9:17-17:21, ABRE Resp. App'x 1161-69; Meares Dep. Tr., 7:22-19:20, ABRE Resp. App'x 1226-38).

[86] *See supra* note 68.

responds that (a) the Third Amended Disclosures were dated a month after the expert disclosure

deadline, (b) ABRE disclosed the brokers as fact witnesses with a statement that "[t]o the extent

[broker's] evidence may be considered expert testimony or opinions subject to Fed. R. Civ. P.

26(a)(2), ABRE further designates him as such"—which the Trustee argues is not a sufficient expert

witness disclosure—and, finally, (c) none of the brokers produced a Rule 26 report.[87]  The Trustee

also argues that Harris should not be permitted to offer an opinion as to the value of the Three ABRE

Properties because he testified in his deposition that he based his opinions on his professional

experience and not on his personal knowledge, and only experts are permitted to offer opinion

evidence based on their knowledge and experience; fact witnesses cannot.[88] The Trustee argues that

Harris's opinions should be excluded because they "are not credible anyway."[89]

As to this latter point about Harris's opinions not being "credible," a court should not assess

the credibility of a witness at the summary judgment stage—this should be left to the fact finder at

trial.  Thus, the court will not exclude Harris's testimony merely because the Trustee says that it is

not credible.[90] As to the alleged untimely disclosure by ABRE of the three brokers and Harris as

expert witnesses and the ABRE's failure to produce a Rule 26 report, the court concludes that the

Trustee was not prejudiced by the timing of the disclosure or by the failure of the brokers and Harris

to provide Rule 26 reports, so the court will overrule any procedural or technical objection to the

---

[87] *See* Trustee's Reply, 5.

[88] *See* Trustee's Reply, 6. The Trustee argued that "[t]he property owner value testimony exception cannot apply to Harris, who did not personally own anything and whose role did not involve dealing with real property[ ]" and that "property owner opinions are only permitted to the extent they are based on personal, factual knowledge of the properties; they are excluded if based on specialized knowledge." Trustee's Reply, 6 (citing *Fass v. Deutsche Bank Nat'l Tr. Co.*, 2019 WL 2744207, at *6 (W.D. Tex. Apr. 16, 2019)).

[89] Trustee's Reply, 6.

[90] *See Seigler*, 30 F.4th at 476 ("On summary judgment, all facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings."); *see also Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) ("How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage.").

deposition testimony of the brokers and/or Harris. These witnesses were disclosed in time for the Trustee to be able to depose them. In fact, the Trustee did not object to these witnesses providing expert testimony until he filed his Reply in support of his Motion for Partial Summary Judgment and did not include his objections in his separate Motion to Exclude the expert testimony and report of Jason Rae. The court will overrule the Trustee's objections to the deposition testimony of the three brokers and Harris and will not exclude it from the summary judgment record.

### 2. *ABRE's Evidentiary Objections*

In its Response to the Trustee's Motion for Partial Summary Judgment and in a separate pleading[91] filed on December 4, 2024, ABRE objected to certain of the Trustee's summary judgment evidence. In particular, ABRE objected to the inclusion in the summary judgment record of the following: (1) certain allegedly "mischaracterized" deposition testimony of ABRE's corporate representative (ABRE's Rule 30(b)(6) witness), Harris, as being testimony in his capacity "as an Owner/Manager/Officer of the Debtor entities"; (2) certain excerpts of the deposition transcript of Adele Wang (in-house legal counsel for the Debtors and the Owners' related companies, including ABRE) and of Robert Amaro (Vice President and Director of Accounting for the Debtors, ABRE, and other Owners' related companies) on the grounds that they are "speculative, lacking foundation, and lacking personal knowledge"; (3) all portions of the deposition transcripts that the Trustee did not cite to in his briefing on the cross-motions for summary judgment because "[t]he Trustee should not be permitted to dump hundreds of pages of testimony into the record in case he decides he needs to rely on it";[92] and (4) certain portions of the report of the Trustee's expert Lynton Kotzin of J.S.

---

[91] *See Defendant AB Real Estate, LLC's Objections to Trustee's Motion for Partial Summary Judgment Evidence* ("Objections to Summary Judgment Evidence"). Dkt. No. 95.

[92] Objections to Summary Judgment Evidence, 3-4 (citing *Mackey v. Children's Med. Ctr. of Dallas,* No. CIV.A. 3:05-CV-043-L, 2006 WL 2713788, at *2 (N.D. Tex. Sept. 22, 2006), for the proposition that "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence" on summary judgment and for the district court's statement that including "three entire deposition transcripts as summary judgment evidence" were improper and unduly burdened the court.).

Held, LLC ("Kotzin Report") because (a) the Trustee miscites it by claiming it contains information or evidence that it does not contain, and (b) Kotzin's opinions regarding insolvency and reasonably equivalent value in connection with the ABRE transfers are unsupported and improper and should not be considered.[93]

First, as a procedural matter, ABRE did not seek a hearing on its Objections to Summary Judgment Evidence, instead asking the court to consider its evidentiary objections in the context of these cross motions for summary judgment. The Trustee filed a response to ABRE's objections to his summary judgment evidence on December 26, 2024.[94] The Trustee objected to ABRE's separate objections as being a procedurally improper "disguised quasi-*Daubert*" motion that was not filed before the dispositive motions deadline, which was October 25, 2024, but acknowledged that ABRE had initially included its objections to the Kotzin Report in its Motion for Summary Judgment, so they may not, technically, be untimely (although improper for other reasons).[95]

ABRE's request of the court to consider the reliability and admissibility of the Trustee's expert's report and testimony in the context of its consideration of the cross-motions for summary judgment and not through a separate *Daubert* motion is not procedurally improper; in fact, the court not only may, but must, consider the admissibility and reliability of any expert report or testimony when assessing whether that evidence may be included in the summary judgment record upon which

---

[93] Objections to Summary Judgment Evidence, 4 (citing Fed. R. Evid. 702).

[94] *See Response to ABRE's "Objections" to Evidence* ("Response to Evidentiary Objections"). Dkt. No. 101.

[95] Response to Evidentiary Objections, 2-3 n.3.

the movant may rely for purposes of meeting his burden under Rule 56[96] of showing that there are

no genuine issues of material fact such that the movant is entitled to a judgment as a matter of law.[97]

Turning to the substance of ABRE's evidentiary objections, first as to ABRE's objection

that the Trustee mischaracterized the capacity in which Harris was testifying, in connection with

including Harris's deposition excerpts in the summary judgment record, the court is well aware that

Harris was not testifying "on behalf of" any of the Debtors, when he was testifying during the ABRE

Rule 30(b)(6) deposition, regardless of how the Trustee characterizes the testimony, so the court

will not exclude the excerpts from the ABRE Rule 30(b)(6) transcript from the summary judgment

evidence on the basis that the Trustee has "mischaracterized" it.

Additionally, the court does not believe that the deposition excerpts of Adele Wang and

Robert Amaro were demonstrably "speculative, lacking foundation, [or] lacking personal

knowledge" as argued by ABRE.  Having reviewed the excerpts that ABRE seeks to have excluded

and the parties' arguments regarding the same, the court concludes that such evidence is properly

included in the summary judgment record.

Next, the Trustee argues that, contrary to ABRE's accusations, his inclusion of complete

deposition transcripts in his appendices was proper and that ABRE's citation to the *Mackey*[98] case

---

[96] As noted below, Rule 56(c)(1) requires "[a] party asserting that a fact cannot be or is genuinely disputed" to support that assertion by citing to the summary judgment record or showing "that the materials cited do not establish the absence or presence of a genuine dispute, ***or that an adverse party cannot produce admissible evidence to support the fact[;]***" and subsection (c)(2) allows a party to "***object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.***" (emphasis added).

[97] *See, e.g., Linsley v. C.R. Bard, Inc.,* No. CIV.A.98-2007, 2000 WL 343358, at *3 (E.D. La. Mar. 30, 2000) ("[I]f a party offers expert opinion evidence at a hearing on a motion for summary judgment, the court must determine if such evidence would be admissible at a trial on the merits."); *Bernhardt By & Through Bernhardt v. Richardson-Merrell, Inc.,* 723 F. Supp. 1188, 1191 (N.D. Miss. 1988), aff'd, 892 F.2d 440 (5th Cir. 1990) ("In addressing the motion for summary judgment, the court must consider the reliability and foundation of the experts' opinions."); *see also Munoz v. Orr,* 200 F.3d 291, 300-01 (5th Cir. 2000) (on summary judgment, "the trial court has broad discretion to rule on the admissibility of the expert's evidence" and "may inquire into the reliability and foundation of any expert's opinion[,]" and if the "expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact.") (citations omitted).

[98] *See supra* note 91.

out of the district court for the Northern District of Texas where the court complained of having to "sift through the record in search of" summary judgment evidence where the pages of the appendix were not numbered is inapposite; here, the Trustee numbered every page of his appendices and every citation in his briefing to deposition transcripts contained a pin cite to the specific pages of the appendix being cited. The court does not believe that consideration of the cross motions for summary judgment required the court to "sift through the evidence" or imposed a burden on the court because the evidence the Trustee wished the court to consider was only those pages of the deposition transcripts to which the Trustee cited.

Finally, as to ABRE's objection to the Trustee's expert's Kotzin Report, and Trustee's descriptions of it, this court disagrees that Kotzin's opinions regarding insolvency and reasonably equivalent value in connection with the transfers of the Three ABRE Properties are unsupported and improper and should not be considered. Kotzin appears to have impressive credentials, and he explained his methodologies for determining insolvency—even in the face of sometimes-spotty records—and also seemed to use reliable information in concluding that the Debtors did not receive reasonably equivalent value for the transfers of the Three ABRE Properties. Obviously, his positions can be challenged on cross-examination at trial, but there is no basis to exclude his report or testimony.

Accordingly, the court will not exclude any of the evidence for purposes of determining whether either party is entitled to a summary judgment here.

## C. Substantive Objections to Motions for Summary Judgment

The Trustee argues that he has presented summary judgment evidence to support every element of his fraudulent transfer claims, actual and constructive, and that ABRE has not pointed to any evidence in the record that would create a genuine dispute of material fact with respect to those

claims. Meanwhile, ABRE argues that the Trustee's fraudulent transfer claims fail as a matter of law because:

> (a) the Reelfoot Tennessee Property—which was encumbered by a lien to secure the aforementioned META Note at the time of the Transfer—is not an "asset" of Debtor Fire Mountain, as defined in § 24.002(2)(a) of TUFTA, the transfer of which can be avoided;

> (b) even if the Reelfoot Tennessee Property was an "asset" as contemplated by § 24.002(2)(A) of TUFTA, the court should find from the undisputed evidence that reasonably equivalent value was, indeed, exchanged for it, as a matter of law, through an oral promise by ABRE to one day pay to Debtor Fire Mountain any future sale proceeds realized from an ultimate sale;

> (c) the Trustee has allegedly put forth no genuine evidence of insolvency at the time of the Transfer; and

> (d) as to his actual fraudulent transfer claim, the Trustee has allegedly put forth no direct evidence of actual intent to defraud or of a sufficient number of badges of fraud from which to infer intent.

ABRE also argues that the Trustee's conspiracy-to-commit fraudulent transfer claim should fail as a matter of law, as it is redundant of the fraudulent transfer claims, and, moreover, the Trustee has not pointed to summary judgment evidence that might support each element of a cause of action for conspiracy.

To be clear, the Trustee argues that he is entitled to judgment as a matter of law, on his fraudulent transfer claims, based on the undisputed facts. ABRE argues that it is entitled to judgment as a matter of law on the actual and constructive fraudulent transfer claims as well as the conspiracy-to-commit fraudulent transfers.

### *1.   Fraudulent Transfer Claims Under § 544(b) and TUFTA*

As noted above, Bankruptcy Code § 544(b) allows the Trustee to "avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding an unsecured claim."[99] And, the parties are now in agreement that the "applicable law" here is TUFTA. Under

---

[99] Bankruptcy Code § 544(b)(1).

TUFTA, a qualifying creditor can avoid a fraudulent transfer under TUFTA's actual fraud provisions, § 24.005(a)(1), for transfers of assets made with actual intent to hinder, delay, or defraud any creditor of the debtor. Alternatively, a qualifying creditor can avoid a fraudulent transfer under TUFTA's constructive fraud provisions, under either § 24.005(a)(2) or § 24.006 (for transfers of assets made by a debtor without receiving a reasonably equivalent value in exchange while the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small; or intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due; or the debtor was or became insolvent as a result of the transfer).

One needs to carefully consult the defined terms in TUFTA throughout § 24.002. A "transfer," pursuant to § 24.002(12) means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with *an asset* or an interest in an asset . . . ." (Emphasis added.) And TUFTA defines an "asset," at § 24.002(2), as "property of the Debtor,"[100] but the statute *excludes* from the definition of asset "property to the extent it is encumbered by a *valid lien*."[101] Meanwhile, "valid lien" is defined at § 24.002(13) as meaning "a lien that is *effective against the holder of a judicial lien subsequently obtained* by legal or equitable process or proceedings." (Emphasis added.)

As noted above, the Trustee seeks a summary judgment as to both of his constructive and actual fraudulent transfer claims, and ABRE seeks a summary judgment as to both of the Trustee's claims as well. Because the Trustee, as plaintiff, would bear the burden of proof at trial with respect to his fraudulent transfer claims under TUFTA, the Trustee has the burden at the summary judgment

---

[100] TUFTA § 24.002(2).

[101] TUFTA § 24.002(2)(A) (emphasis added); *see also In re 1701 Com., LLC,* 511 B.R. 812, 826 (Bankr. N.D. Tex. 2014) ("Texas law defines an 'asset' as 'property of a debtor,' but expressly excludes 'property to the extent it is encumbered by a valid lien.'").

stage of making a showing sufficient to establish the existence of the elements essential to his claims

and that there are no genuine issues of material fact that would defeat summary judgment. As the

defendant moving for summary judgment, ABRE does not need to negate the elements of the

Trustee's claims, but can meet its initial burden by pointing out the absence of summary judgment

evidence supporting the Trustee's claims. The burden then falls upon the nonmoving party to show,

by pointing to specific evidence in the record, the existence of a genuine issue of material fact that

would defeat summary judgment.

<u>With Regard to Both the Actual and Constructive Fraudulent Transfer Claims, Are There Genuine
Issues of Disputed Fact with Regard to Whether the Reelfoot Tennessee Property Transfer was an
"Asset" Pursuant to § 24.002(2) of TUFTA?  Yes.</u>

As alluded to above, a threshold requirement of a fraudulent transfer claim—both actual and

constructive—is that the Debtor transferred an ***"asset"*** or an "interest in an asset."[102] TUFTA

defines an asset as "property of the Debtor,"[103]  but, as noted above, the statute **excludes** from the

definition of "asset" "property ***to the extent it is encumbered by a valid lien***."[104] (Emphasis added.)

This means that "a transfer of property that is fully encumbered by valid liens may not, as a matter

of law, constitute a fraudulent transfer under the TUFTA."[105] And valid liens must be effective

against a subsequent judicial lien.[106]

---

[102] TUFTA § 24.002(12) (emphasis added); *In re 1701 Com.,* 511 B.R. at 826 ("Under Texas law, a fraudulent transfer begins with a debtor either transferring an asset or incurring an obligation."); *Ingalls v. SMTC Corp. (In re SMTC Mfg.),* 421 B.R. 251, 279 (Bankr. W.D. Tex. 2009) ("The Court's analysis of the broad issue of whether the Debtor in this case transferred any asset begins with the undisputed legal proposition that TUFTA does not apply to 'an alleged fraudulent transfer of property to the extent that such property is encumbered by a security interest.'") (quoting *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009)) (additional citations omitted).

[103] TUFTA § 24.002(2).

[104] TUFTA § 24.002(2)(A); *see also In re 1701 Com.,* 511 B.R. at 826 ("Texas law defines an 'asset' as 'property of a debtor,' but expressly excludes 'property to the extent it is encumbered by a valid lien.'").

[105] *Id.; see also In re Drinks Unique, Inc.,* No. 10-40196-BTR, 2010 WL 3491184, at *11 (Bankr. E.D. Tex. Aug. 27, 2010) ("The property alleged to have been fraudulently transferred was encumbered by a valid lien, and, therefore, is not an asset that may be fraudulently transferred [under TUFTA].").

[106] *See* TUFTA § 24.002(13) (definition for "valid lien").

Thus, here, the Trustee bears the burden of proving that the Reelfoot Tennessee Property was, indeed, an "asset" at the time of the transfer as a foundational issue.[107] Herein lies the rub. The parties seem to acknowledge that the Reelfoot Tennessee Property was part of a package of collateral provided by seven different Debtors (including Debtor Fire Mountain and Debtor OCB Restaurant) that secured the META Note and that META—pursuant to a separate Security Agreement put into the summary judgment record—essentially had a blanket lien on all of those seven Debtors' assets, including those of the Debtor Fire Mountain (the transferor of the Reelfoot Tennessee Property). However, as indicated early on, nowhere in the summary judgment record is there a ***recorded*** copy of the META Security Agreement or copies of ***recorded*** deeds of trust/mortgages for any of the Three ABRE Properties. ***Only a recorded/perfected lien is a valid lien effective against the holder of a subsequent judicial lien***, for purposes of TUFTA § 24.002(13) and (2)(A). Thus, for this reason alone, there is a disputed material fact issue as to whether the Reelfoot Tennessee Property was an "asset" for purposes of TUFTA. Was there a recorded valid lien on the Reelfoot Tennessee Property? The court has no way of knowing at this point. It is hard to conceive that sophisticated parties and lawyers would have dropped the ball on recording liens/deeds, but it sometimes happens. In fact, the court has seen evidence in this record of it happening at least once.[108]

But there's more reason to find a disputed fact issue on this point. Let's assume that there were, in fact, recorded deeds (i.e., "valid liens" that would be "effective against the holder of a judicial lien subsequently obtained") in favor of META, as to the Reelfoot Tennessee Property (and

---

[107] *SMTC*, 421 B.R. at 278-79 ("Proof that assets were transferred and an assessment of their value are essential to sustaining a fraudulent conveyance action [under TUFTA][, and] the Trustee bears the burden of proving all elements of his TUFTA claims by a preponderance of the evidence.") (citations omitted).

[108] This court noted earlier herein that the summary judgment shows that, shortly before the closing on the February 25, 2020 sale of the 29th Street Wisconsin Property (for a handsome price of $925,000), a title company discovered that the quitclaim deed from December 2018, purporting to convey this property from Debtor OCB Restaurant to ABRE, was never recorded. That fact was quickly rectified in January 2020, so that ABRE could be the owner/seller in that transaction.

as to all of the Three ABRE Properties, for that matter). This is not the end of the analysis. One must

inquire as to what *extent* those META liens encumbered the transferred property, pursuant to

TUFTA § 24.002(2)(A). The Trustee has pointed to summary judgment evidence that the balance

due under the META Note at the time of the Transfer was $1,312,500 (and the court has not seen

summary judgment evidence that really contradicts this).  But the parties do not remotely agree on

the value of the Reelfoot Tennessee Property or of META's other collateral owned by Debtor Fire

Mountain or the other six makers on the META Note, and both parties challenge the other party's

summary judgment evidence on the valuation issue. As noted earlier, the Trustee points to

"retroactive" appraisal reports that suggest valuations, as of the dates of the respective transfers of

the Three ABRE Properties, of (a) $323,000 on the Highway 28 South Carolina Property; (b)

$1,000,000 on the Reelfoot Tennessee Property; and (c) $1,545,000 on the 29th Street Wisconsin

Property. In addition, the Trustee points to a 4.719-acre real property located in Rocky Mount, North

Carolina that was owned by Debtor Fire Mountain, 2.5 acres of which were sold during the 2021

Bankruptcy Case for $100,000. The Trustee also points to evidence that certain non-realty contents

of the 29th Street Wisconsin Property (also META's collateral) were sold at an auction for gross

proceeds of over $208,000 and net proceeds of over $175,000. Finally, the Trustee points to "[a]ll

other assets of the six [sic] Debtors liable on the [META] Note, including Tahoe Joe's . . . . Although

the complete value of these assets has not been determined, Debtor assets that were sold for

$4,212,000 to BBQ Growth, LLC during the 2021 Bankruptcy Case belonged primarily or

exclusively to Tahoe Joe's" who was a maker on the META Note.

ABRE has put in evidence of much different/lower values.  But notably, even the Trustee's

valuation of the Reelfoot Tennessee Property ($1,000,000) at the time of the Transfer was more than

$300,000 below the indebtedness owed at the time to META ($1,312,500). That being the case,

should the court, as a matter of law, consider the Reelfoot Tennessee Property to have been "fully

encumbered" under Texas law, such that the Reelfoot Tennessee Property should not be deemed to have been an "asset" under TUFTA? Or, must the Reelfoot Tennessee Property be considered under Texas law to have been only ***partially*** encumbered (when considering the value of ***all*** of the Debtor Fire Mountain's property that was subject to a META lien—or maybe even when considering all of the value of all of the property of all seven Debtors whose property was subject to a META lien)? Again, this goes to the question of whether that Reelfoot Tennessee Property would legally constitute an "asset"—since TUFTA excludes from the definition of "asset" a transferor's property only "***to the extent it is encumbered by a valid lien***." The Trustee argues the court must consider the value of all of META's collateral, and ABRE argues that one zeros in on the fact that, standing alone, the value of the Reelfoot Tennessee Property was less than the amount of the META indebtedness at the time of the Transfer.

The bankruptcy court in the *SMTC* case faced a similar situation, except that the debtor-transferor in *SMTC* had been a guarantor (not an actual maker) under a secured loan facility under which numerous of the debtor's non-debtor affiliates were primarily liable on the debt, and all of the guarantor debtor's assets were subject to a blanket lien in favor of the secured creditor. The defendant (i.e., alleged fraudulent transferee) in that case argued that none of the transfers to it had involved "assets" subject to "transfer" under TUFTA § 24.002(2)(A) because all of the debtor's assets were covered by a valid lien. Moreover, the defendants "assert[ed] that whether the Debtor was liable for the entire balance on the [secured loan] or for only a portion of it, at the time of each conveyance by the Debtor the amount of its liability, and the corresponding extent of the lien, exceeded the value of the particular item or items of property that the Debtor conveyed." The bankruptcy court recognized that "[u]nder this argument [of the defendants] *each* of those items of

property was not an 'asset' that could have been 'transferred' under TUFTA."[109] The defendants also argued that the Fifth Circuit's opinion in *Mullins* mandated such a result.[110] The defendants argued, alternatively, that "even if the value of *all* of the Debtor's property that was subject to the lien was considered, because the Debtor was liable for the entire balance of the [secured loan], the value of the lien which secures the [secured loan] exceeded the combined value of all **the Debtor-transferor's** property, and so at all times the Debtor's property was fully encumbered" and, therefore, "none of the conveyances by the Debtor was a 'transfer' that involved an 'asset' of the Debtor."[111]

The bankruptcy court noted that there were two legal questions presented to it "in connection with its decision on whether an 'asset' could have been the subject of a 'transfer[,]'" and they were:

> (1) how to decide whether property conveyed is fully encumbered *in the context of a blanket lien covering all assets of a debtor*—i.e., whether the Debtor should be considered to have conveyed some of its encumbered property, or some of its equity with each conveyance; and (2) whether, for purposes of a TUFTA analysis, the Debtor [which was a guarantor] should be considered to have been liable for the entire [secured loan] balance.[112]

The trustee in the *SMTC* case had meanwhile argued that, under *Mullins*, "if the facts show that the value of *all* the Debtor's property was greater than the amount of debt secured by the lien, the property transferred should be considered to represent part of that equity rather than part of the encumbered collateral, so that *each* conveyance involved property that was not fully encumbered—i.e., each conveyance involved an 'asset' that was 'transferred.'"[113]

The bankruptcy court ultimately agreed with the trustee:

> In this case, truly *all* of the Debtor's property is undisputedly subject to the lien. Thus, the Court agrees with the Trustee that if the total value of all property exceeded

---

[109] *SMTC*, 421 B.R. at 280.

[110] *See id.* (citing *Mullins v. TestAmerica, Inc.*, 564 F.3d 386 (5th Cir. 2009)).

[111] *Id.* at 280-81.

[112] *Id.* at 281 (noting that the first question hinged on the court's interpretation of the holding in *Mullins*) (emphasis added).

[113] *Id.* at 282.

the amount of the debt that it secured at the time of a conveyance, each item of property that was conveyed should be considered part of the Debtor's equity, and not fully encumbered. Therefore, as to any such "assets," the Debtor "transferred" them within the meaning of TUFTA.[114]

This court notes that the *SMTC* case involved a blanket lien on all of a transferor debtor's assets (with its affiliates who were co-obligors on a secured note not being in bankruptcy). Here, even more compelling, ***there is a blanket lien on all of the assets of all of the makers under the META Note—but all seven of those makers (including transferor/Debtor Fire Mountain) are in bankruptcy and all seven were substantively consolidated under the plan from the 2016 Bankruptcy Case through which META obtained the META Note and all associated liens***.

This court concludes, at a minimum, that, as a matter of law, if the total value of all of the Debtor Fire Mountain's assets that served as META collateral, at the time of the Transfer, exceeded the amount of the indebtedness owed under the Meta Note at the time of the Transfer (which seems to have been $1,312,500), then, to the extent of the value of that overall equity, the Reelfoot Tennessee Property should be considered an "asset" that was "transferred" under TUFTA. The mere fact that the Reelfoot Tennessee Property may have been subject to a "valid lien" does not exclude the entire property from the definition of "asset" under TUFTA. Moreover, given the substantive consolidation of the makers on the META Note pursuant to the terms of the 2016 Bankruptcy plan, the court concludes that it is appropriate here to compute the encumbrance-equity ratio (at the time of the Transfer) by looking at the total value of the entire collateral package provided by the seven Debtors that were makers on the META Note, as opposed to simply focusing on: (a) the value of

---

[114] *Id.* at 283. As to the second of the "legal questions" the court was presented with—the trustee had argued that "the Debtor's liability [as guarantor] for the [secured loan] Loan was contingent or should be discounted to an amount reflecting the likelihood it would have to pay on its full guaranty on the [secured loan] [and] [t]herefore . . . there was equity in the Lenders' collateral, their lien did not fully encumber the Debtor's property, and its 'assets' were thus 'transferred' (both as defined in TUFTA)"—the court found that "it is proper and necessary to consider the probability that the Debtor would have to pay [its obligation under its guarantee]" where the entire group of the Debtor's affiliates were liable under the secured loan. *Id.* at 283, 287-88.

the Reelfoot Tennessee Property; or (b) the value of all of Debtor Fire Mountain's property at the time of the Transfer.

The bottom line is that there is disputed summary judgment evidence on the value, at the time of the Transfer, of: (a) the Reelfoot Tennessee Property; (b) all of the Debtor Fire Mountain's property; and (c) all of the property of all of the seven makers on the META Note (all of which provided a lien on all of their assets to META, and all of whom were substantively consolidated under the 2016 Bankruptcy plan). The Trustee has met his initial burden as movant of pointing to facts in the summary judgment evidence that support his argument that the Reelfoot Tennessee Property was an "asset" pursuant to TUFTA § 24.002(2)(A), and ABRE has put forth evidence that might contradict that (given ABRE's very different ideas about value). Thus, neither party is entitled to summary judgment on the fraudulent transfer claims. To be clear, no one has presented unrefuted evidence as to what was due under the META Note at the time of the Transfer (the Trustee has presented his best guess), and no one has presented evidence of the overall value of META's collateral.

<u>With Regard to the Constructive Fraudulent Transfer Claim, Are There Genuine Issues of Disputed Fact with Regard to Whether "Reasonably Equivalent Value" Was Given in Exchange for the Transfer? Yes.</u>

As noted above, the elements of the Trustee's constructive fraudulent transfer claim are set forth in TUFTA § 24.005(a)(2), which states that a transfer by a debtor can be avoided if the debtor made the transfer

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Section 24.006 of TUFTA also permits avoidance of a transfer for less than reasonably equivalent value if the debtor was insolvent or was rendered insolvent because of the transfer.

The burden of proving a lack of reasonably equivalent value falls on the Trustee – the party seeking to avoid the Transfer as a constructively fraudulent conveyance.[115] The Trustee also bears the burden of proof on the issue of insolvency of the debtor/transferor (for both constructive fraud and actual fraud, as a badge of fraud) at the time of the transfer, as he does with respect to all elements of his claims under TUFTA.[116] Here, the Trustee argues that he has pointed to evidence in the summary judgment record that Debtor Fire Mountain did not receive reasonably equivalent value in exchange for the Reelfoot Tennessee Property Transfer by pointing to the quitclaim deed, itself, which contained a sworn acknowledgment signed by Donbavand that stated that "THE ACTUAL CONSIDERATION FOR THIS TRANSFER IS $0.00[,]" and that none of the proceeds of the subsequent sale by ABRE of the Reelfoot Tennessee Property "were remitted to Fire Mountain or any other Debtor."[117] But, the Trustee's assumption that no "value" was given in exchange for the transfer focuses only on monetary consideration and ignores evidence in the summary judgment record, including in the quitclaim deed itself, that other consideration could have been and was provided to Debtor Fire Mountain by ABRE in exchange for the Reelfoot Tennessee Property Transfer. The Reelfoot Tennessee Property quitclaim deed actually reflects the payment of "the sum of one dollar ($1.00) *and other valuable considerations*."[118] And, ABRE points to evidence in the

---

[115] *Yaquinto v. CBS Radio, Inc. (In re Texas E&P Operating, Inc.)*, 2022 WL 2719472, *13 (Bankr. N.D. Tex., July 13, 2022) (citing *In re McConnell*, 934 F.2d 662, 665 n.1 (5th Cir. 1991) and *Altus Brands II, LLC v. Alexander*, 435 S.W.3d 432, 441 (Tex. App.—Dallas 2014, no pet.).

[116] *See Shelley v. Walnut Place Nursing Home*, No. 05-94-01047-CV, 1995 WL 73094, *5 (Tex. App.—Dallas Feb. 23, 1995, no pet.) (not designated for publication) ("A creditor attacking a conveyance has the burden to establish the debtor's insolvency at the time of the conveyance."); *see also SMTC*, 421 B.R. at 279 ("[T]he Trustee bears the burden of proving all elements of his TUFTA claims by a preponderance of the evidence.").

[117] *See* Trustee's Motion for Partial Summary Judgment, 8-9.

[118] *See* Trustee App'x 275-77 (emphasis added).

record that ABRE provided value in the form of a verbal promise to repatriate the sale proceeds back to or for the benefit of the Debtors; that the Trustee testified that he had no basis to dispute the existence of the verbal promise (but that he had not investigated the issue);[119] and that Kotzin testified that he did not consider the promise in his assessment of consideration or benefits provided by ABRE to Debtor Fire Mountain; rather, his "analysis focused more on tangible proceeds that are cash proceeds that were received[,]" and he "did not analyze any potential indirect benefits that may or may not have been received from the transfer."[120]

ABRE argues that the Trustee ignores "undisputed" evidence in the record that "the Debtors and ABRE agreed that all proceeds from the eventual sale of the Reelfoot Tennessee Property (and the other two of the Three ABRE Properties) would be returned to the Debtors or used for the benefit of the Debtors."[121] The Trustee argues that he has disputed this evidence, primarily by objecting to the inclusion in the summary judgment record of the Kemp Declaration as being a "sham affidavit"[122] and as inadmissible parole evidence that contradicts the quitclaim deed. In addition, the Trustee argues that any alleged promise would be unenforceable under the statute of frauds. Other than these "evidentiary" objections to ABRE's evidence of an alleged verbal promise given in consideration for the transfers of the Three ABRE Properties, including the Reelfoot Tennessee Property Transfer, the Trustee does not argue that a promise cannot constitute value under TUFTA as a matter of law.[123] ABRE, on the other hand, does argue that a promise can constitute reasonably equivalent value under TUFTA, even if the promise is unperformed.

---

[119] David Gonzales Dep. Tr. 116:8-22, ABRE App'x 60.

[120] Lynton Kotzin Dep. Tr. 275:2-6, ABRE App'x 746.

[121] *See* ABRE's Response, 11 (citing ABRE Rule 30(b)(6) Dep. Tr. 35:14-19, 39:8-12, ABRE Resp. App'x 25-26; Kemp Decl. ¶ 6, ABRE Resp. App'x 86 ("At the time of transfer, ABRE agreed that any proceeds from the eventual sale of the ABRE Properties would be returned to the Debtors or would be used for their benefit.")).

[122] For the court's discussion of the Trustee's "sham affidavit" argument and the court's overruling of this objection to ABRE's summary judgment evidence, *see supra* pp.18-20.

[123] *See generally* Trustee's Supplemental Brief.

The court will address, first, the legal issue, because if the alleged promise cannot constitute

value under TUFTA as a matter of law, then the Trustee will ultimately prevail—at least as to the

reasonably equivalent value issue—because ABRE's evidence becomes irrelevant and incapable of

creating a genuine issue of *material* fact.[124] ABRE has cited numerous cases within the Fifth Circuit

as well as from other circuits that hold, as a matter of law, that promises of future conduct or

speculative future benefits can provide reasonably equivalent value in the fraudulent transfer

context, including even if the future promised benefit is never fulfilled.[125] In *Janvey v. Golf Channel*,

the Texas Supreme Court answered the following question that had been certified to it by the federal

Fifth Circuit:[126]

> Considering the definition of "value" in section 24.004(a) of [TUFTA], the
> definition of "reasonably equivalent value" in section 24.004(d) of [TUFTA], and
> the comment in [UFTA] stating that "value" is measured "from a creditor's
> viewpoint," what showing of "value" under TUFTA is sufficient for a transferee to

---

[124] *See Hutton Commc'ns, Inc. v. Commc'n Infrastructure Corp.*, 461 F.Supp.3d 400, 403 (N.D. Tex. 2020) (citing *Anderson*, 477 U.S. at 248). The parties provided additional briefing on this issue in their supplemental briefs filed March 10, 2025.

[125] *See* ABRE Supplemental Brief, 8 (citing *Matter of Louisiana Pellets, Inc.,* 838 F. App'x 45, 50–51 (5th Cir. 2020) (finding value in "promise to perform work" and affirming bankruptcy court's ruling of no constructive fraudulent transfer); *Janvey v. Golf Channel, Inc.,* 792 F.3d 539, 546 (5th Cir. 2015) (recognizing that even "speculative or potential gains" that "at least had the potential to benefit the debtor's creditors" can be reasonably equivalent value); *In re Treasure Valley Opportunities, Inc.,* 166 B.R. 701, 704–05 (Bankr. D. Idaho 1994) (finding promise was reasonably equivalent value despite fact that promise was not fulfilled, because "[h]ad the promise been performed, the creditors of the debtor would certainly have benefitted."); *In re Mirant Corp.*, No. 03-046590 DML, 2010 WL 8708772, at *31 (Bankr. N.D. Tex. Apr. 22, 2010) ("Moreover, the opportunity to receive an economic benefit in the future can constitute value under the Bankruptcy Code."); *In re White*, No. AP 16-2089, 2024 WL 698232, at *7 (B.A.P. 10th Cir. Feb. 21, 2024) (finding reasonably equivalent value where transferor received "benefits including the opportunity to run a business that could have resulted in long term prosperity"); *see also Janvey v. Golf Channel, Inc.,* 487 S.W.3d 560, 574 (Tex. 2016) (where TUFTA excludes one type of promise from its definition of value, "it follows that other types of enforceable promises made or performed in the ordinary course of the promisor's business would constitute value under TUFTA"); *see also Bowman v. El Paso CGP Co., L.L.C.*, 431 S.W.3d 781, 786 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (reversing trial court's grant of summary judgment on fraudulent transfer claim under TUFTA and stating that "an unperformed promise may provide value.").

[126] *Janvey v. Golf Channel*, 487 S.W.2d at 564. The court notes that, in the case at bar, we are not analyzing "reasonably equivalent value" as part of a transferee's *good-faith defense* under TUFTA 24.009(a), but a lack of "reasonably equivalent value" as an element of the plaintiff's claim under TUFTA § 24.005(a)(2) and a potential "badge of fraud" under TUFTA § 24.004(a)(1) and (b). But, the definitions of "value" and "reasonably equivalent value" as used in all three provisions are the same, so the Texas Supreme Court's interpretation in *Janvey v. Golf Channel* of "value" and "reasonably equivalent value" under TUFTA § 24.009(a) would apply equally to those terms as used in TUFTA §§ 24.005 or 24.006.

prove the elements of the [good-faith] affirmative defense under section 24.009(a) of [TUFTA]?

In its analysis, the Texas Supreme Court stated that "TUFTA's general definition of 'value' is . . . illuminating in what it expressly excludes from the definition: '[V]alue does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.'"[127] It then reasoned that "[f]rom the exclusion of unperformed promises not made in the ordinary course of business, it follows that other types of enforceable promises made or performed in the ordinary course of the promisor's business would constitute value under TUFTA."[128] The court noted that

> While the definitions of "value" and "reasonably equivalent value" are expansive and nonexclusive, there is nevertheless an implicit requirement that the transfer confer some direct or indirect economic benefit to the debtor, as opposed to benefits conferred solely on a third-party, transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor or transferee.[129]

The Trustee does not challenge that this is the state of the law in Texas. Rather, the Trustee argues that (1) he has met his initial summary judgment burden by pointing to evidence that establishes a prima facie case of lack of reasonably equivalent value based on language in the quitclaim deed that the Reelfoot Tennessee Property was transferred to ABRE in exchange for $0.00 based on an acknowledgment that was attached to the quitclaim deed[130] and evidence of the value of the Reelfoot Tennessee Property at the time of the transfer, (2) the burden then shifts to ABRE to point to the existence of a genuine dispute of a material fact that would preclude summary judgment, which

---

[127] *Id.* at 574.

[128] *Id.* (noting further that "the exclusion suggests that the nature of the transaction as being in the ordinary course of business *or* involving a promise performed bears more than a passing relevance to the 'value' inquiry.") (emphasis added).

[129] *Id.*

[130] As noted above, the language of the quitclaim deed itself is that the "the sum of one dollar ($1.00) and other valuable considerations" was given as consideration—something the Trustee fails to mention.

ABRE cannot meet.[131]  The Trustee argues that, as an evidentiary matter, ABRE simply cannot point to evidence in the summary judgment record to support its claim that the alleged promise actually existed.

ABRE disagrees with the Trustee's assessment of the evidence as to both the existence of the promise and the value of the Reelfoot Tennessee Property as of the time of the transfers. As to the existence of the promise, the Trustee argues that ABRE is prohibited under the statute of fraud and the parole evidence rule from pointing to evidence outside of the quitclaim deed as evidence of consideration (other than the stated monetary amount of $1.00) given to Debtor Fire Mountain in exchange for the transfer. ABRE denies that its promise is unenforceable or voidable for any reason, but argues that even if it were, "[t]he mere fact that a contract is void, unenforceable, or illegal does not require a finding that there was no reasonably equivalent value given . . . ."[132] In addition, ABRE points out that the Trustee has not demonstrated that there are no genuine issues of material fact regarding the enforceability of ABRE's promise, including whether an exception to the statute of frauds, such as partial or full performance, might apply here. ABRE's argues that "[t]he Trustee's argument that ABRE's promise to return the proceeds of the sale of the properties cannot be value because it violates the parol evidence rule by attempting to vary the terms of the deeds is also without merit, even if it applied[,]" because "courts routinely find that parol evidence is admissible to show the existence of consideration beyond that reflected in a deed."[133]

---

[131] Trustee's Supplemental Brief, 9 (quoting *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)) ("If the movant makes out a prima facie case, the burden shifts to the nonmovant to demonstrate the existence of a genuine dispute of material fact precluding summary judgment.").

[132] ABRE Supplemental Brief, 9 (quoting *In re Kendall*, 440 B.R. 526, 532 (B.A.P. 8th Cir. 2010) and citing *In re Tsirambidis*, No. 14-14938, 2015 WL 7307325, at * 4–5 (Bankr. N.D. Ohio Nov. 19, 2015)).

[133] ABRE Supplemental Brief, 17 (citing *Buccaneer's Cove, Inc. v. Mainland Bank*, 831 S.W.2d 582, 584 (Tex.App.—Corpus Christi 1992, no writ) ("The true consideration for a deed may be shown by parol evidence to be different from that expressed in the deed."); *Hitz v. Nat'l Metro. Bank*, 111 U.S. 722, 727, 4 S. Ct. 613, 615, 28 L. Ed. 577 (1884) ("We do not concur in the view of the learned court below, that because the sum of one dollar is mentioned in this trust deed as the consideration, the true consideration cannot be shown by parol evidence. It is always understood that the one

The court agrees that the Trustee has not shown that either the Texas statute of frauds or the parol evidence rule would preclude ABRE from presenting evidence of its promise to return the proceeds of the sale. ABRE has met its burden of demonstrating the existence of a genuine issue of material fact regarding the existence of its promise and the value it provided to Debtor Fire Mountain for purposes of determining whether the transfer lacked an exchange of reasonably equivalent value under TUFTA.

The Trustee also claims to have met his summary judgment burden with respect to the value of the Reelfoot Tennessee Property at the time of the transfer (as it relates to the reasonably equivalent value issue) by presenting an "uncontroverted" appraised value of the Reelfoot Tennessee Property of "at least $1,000,000" on the date of the transfer,[134] suggesting that there is no other evidence in the summary judgment record regarding value. The Trustee is wrong. While it is true that ABRE did not submit formal appraisal reports, it is not true that ABRE has offered no evidence of valuation. First, ABRE has submitted depositions of the real estate brokers who were involved with selling or attempting to sell each of the Three ABRE Properties, each of whom testified as to his expert opinion of the value of each property and as to his concerns with the Trustee's appraisals, based on his expertise in the property's geographical region. As to the value of the Reelfoot Tennessee Property and criticisms of the Trustee's appraisal, ABRE submitted the deposition testimony of Steven Harbison. ABRE also points to evidence in the record regarding the listing price for the sale of the Reelfoot Tennessee Property and the fact that it did not sell at that price as well as the subsequent sale price of the Reelfoot Tennessee Property to an unrelated buyer

dollar in such connection is merely nominal, and is never actually paid."); *Lopez v. Rivas,* No. 01-14-00592-CV, 2015 WL 1967594, at *3 (Tex. App.—Houston [1st Dist.] Apr. 30, 2015, no pet.) ("Here, we conclude that Mayra and Linda's testimony concerning the oral promise was admissible to show the actual consideration given for the deed because it did not contradict or vary the deed's terms. The deed states that, in addition to $10, "other good and valuable consideration" was given for the deed. Deeds ordinarily embody such recitals of nominal consideration and "other good and valuable consideration."")).

[134] Trustee's Motion for Partial Summary Judgment, 21.

in an arms' length transaction as additional evidence that creates a genuine issue of material fact on the issue of the value of the Reelfoot Tennessee Property.[135]

The court concludes the parties have each pointed to evidence in the record that demonstrates the existence of a genuine issue of material fact on the issue of value. Thus, neither party is entitled to a summary judgment on the Trustee's constructive fraudulent transfer claims due to this disputed issue.

<u>With Regard to the Constructive Fraudulent Transfer Claim, Are There Genuine Issues of Disputed Fact with Regard to Insolvency?  Yes.</u>

The Trustee asserts that he has also met his summary judgment burden as to the issue of Debtor Fire Mountain's insolvency at the time of the Reelfoot Tennessee Transfer and that ABRE has not pointed to any controverting evidence so as to create a genuine issue of material fact to defeat the Trustee's summary judgment. ABRE argues that it, as the defendant, is entitled to summary judgment because the Trustee has not presented any evidence on this essential element of the Trustee's claim for constructive fraudulent transfer of the Reelfoot Tennessee Property. The Trustee points to one, and only one, piece of evidence in support of the insolvency issue: a single page (page 39) of the Kotzin Report.[136] ABRE argues that page 39 of the Kotzin Report does not include any opinion that Debtor Fire Mountain was insolvent ***on the date of the Reelfoot Tennessee Property Transfer*** and that Kotzin does not analyze any financial information for Debtor Fire Mountain at or around the December 10, 2018 transfer date. ABRE contends that, at most, the Kotzin Report states that Debtor Fire Mountain had a net loss for the trailing twelve months ending June of 2016 (which was prior to the Debtor's 2017 exit from their previous bankruptcy case), as well as alleged negative member's equity as of July 2015, June 2016, December 2017, and June

---

[135] *See* ABRE's Response, 13.

[136] *See* Trustee's Motion for Partial Summary Judgment, 21 (citing Kotzin Report, 39, Trustee App'x 359) ("Fire Mountain was insolvent before, at the time of, and after the [transfer].").

2018, and, therefore, "Fire Mountain's working capital deficits were also substantial as of each respective date."[137] ABRE argues that because the Kotzin Report provides no conclusion regarding Debtor Fire Mountain's insolvency as of December 2018, the Trustee has provided **no** evidence on the issue of insolvency, and, therefore, ABRE is entitled to summary judgment on the Trustee's constructive fraudulent transfer claim.

The court disagrees. The evidence the Trustee has provided through the Kotzin Report is at least somewhat probative as to whether Debtor Fire Mountain was insolvent at the time of the Transfer, so as to establish the existence of a genuine issue of material fact on the insolvency issue. This issue will need to be tried. Thus, the Trustee is not entitled to a summary judgment on his constructive fraud claim under TUFTA §§ 24.005(a)(2) or 24.006 and neither is ABRE entitled to summary judgment based on its argument that the Trustee has failed to meet his burden of pointing to evidence in the record of Debtor Fire Mountain's insolvency at the time of the Transfer.

These are further reasons to deny both parties motions for summary judgment, so the court will deny both motions for summary judgment as to the Trustee's constructive fraudulent transfer claim.

<u>Are There Genuine Issues of Disputed Fact with Regard to Intent to Defraud in Connection with the Trustee's Actual Fraudulent Transfer Claim?  Yes.</u>

The Trustee's actual fraudulent transfer claim is governed by TUFTA § 24.005(a)(1), which states that a transfer made by a debtor can be avoided if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." The Trustee has the burden of proof

---

[137] Kotzin Report, 39, Trustee App'x 359 (citing to Exhibits 2 through 4 (balance sheet summaries for certain of the Debtors, including Debtor Fire Mountain, as of "Various Dates" in 2016, 2017, and 2018, respectively) and Exhibit 48 ("Fire Mountain Restaurants, LLC – Historical Balance Sheets"), Trustee App'x 412-414, 480). The court notes that Exhibit 48 does show negative shareholders' equity for Debtor Fire Mountain as of July 1, 2015, June 29, 2016, and December 27, 2017, but the shareholders' equity is actually positive as of June 27, 2018. The numbers in Exhibit 48 are qualified by a footnote: "We note that the internally prepared balance sheets for 2017 and 2018 did not balance and were therefore, *assumed* to be a work-in-progress. Nonetheless, the total liabilities exceeded the total assets as of both dates and is therefore *likely consistent with* the negative equity in 2015 and 2016." (emphasis added).

that the Transfer was made "with the actual intent to hinder, delay, or defraud" creditors.[138] Whether a transfer was made with actual fraudulent intent is a fact question.[139] Given that direct evidence of actual intent is rarely available, courts typically rely on circumstantial evidence, known as badges of fraud, to infer intent.[140] TUFTA provides a non-exclusive list of badges of fraud that may be considered in determining actual intent on the part of a debtor.[141] The badges of fraud listed in the statute are:

1. the transfer or obligation was to an insider;

2. the retained possession or control of the property transferred after the transfer;

3. the transfer or obligation was concealed;

4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. the transfer was of substantially all of the debtor's assets;

6. the debtor absconded;

7. the debtor removed or concealed assets;

8. the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

---

[138] *See Osherow v. Nelson Hensley & Consol. Fund Mgmt. (In re Pace)*, 456 B.R. 253, 267 (Bankr. S.D. Tex. 2011) ("Under section 24.005, '[t]he Trustee bears the burden of proof to show, by a preponderance of evidence, that the transfers in question were made by the Debtor with the actual intent to hinder, delay or defraud any creditor of the Debtor.'") (quoting *Ingalls v. SMTC Corp. (In re SMTC Mfg.)*, 421 B.R. 251, 299 (Bankr. W.D. Tex. 2009).

[139] *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App. 2007).

[140] *See In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[141] *See* TUFTA § 24.005(b) (stating "consideration may be given, ***among other factors***, to" the listed badges of fraud) (emphasis added).

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Because the list is non-exhaustive, a court may consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent.[142] There is no clear authority on how many badges of fraud must be present to sufficiently establish actual intent under either TUFTA or the Bankruptcy Code.[143] As a matter of law, a finding of fraudulent intent cannot properly be inferred from the existence of just one "badge of fraud."[144] "While a badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute a fraud per se, several of them when considered together may afford a basis from which its existence is properly inferable,"[145] but "[n]ot all, or even a majority, of the 'badges of fraud' must exist to find actual fraud."[146] Courts in Texas have struggled somewhat regarding just how many badges of fraud must exist to establish actual intent, although generally two or three badges of fraud is regarded as insufficient.[147] Courts "must consider all the factors and the 'totality' of the circumstances."[148]

ABRE argues that the Trustee is not entitled to summary judgment on his actual fraud claim under TUFTA because (1) fraudulent intent is inherently a question of fact that should be reserved for the trier of fact and so is generally not appropriate for summary judgment, (2) the Trustee's purported "badges of fraud" are unsupported by the evidence, and (3) ABRE has provided sufficient

---

[142] *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 (Bankr. N.D. Tex. 2014).

[143] *Tow v. Speer*, Civ. Action No. H-11-3700, 2015 WL 1058080, *11 (S.D. Tex. 2015).

[144] *Ingalls v. SMTC Corp.* (*In re SMTC Mfg.*), 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009).

[145] *United States v. Fernon*, 640 F.2d 609, 613 (5th Cir.1981) (internal citations omitted).

[146] *Soza*, 542 F.3d at 1067 (quoting *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988)).

[147] *See, e.g.*, *1701 Commerce, LLC*, 511 B.R. at 841 (finding three badges of fraud insufficient to infer actual intent, two of which were insolvency and pending litigation badges); *SMTC*, 421 B.R. at 300 ("Proof of four to five badges of fraud has been found sufficient in several reported cases," but where at most one badge of fraud can be found, that is insufficient to prove actual intent.); *Byman v. Denson* (*In re Edwards*), 537 B.R. 797, 808 (Bankr. S.D. Tex. 2015) (three badges of fraud not sufficient to prove actual intent under TUFTA); *Taylor v. Trevino*, No. 3:20-CV-393-D, 2021 WL 347566, at *3 (N.D. Tex. Feb. 2, 2021) (fewer than four to five badges of fraud "may be insufficient to establish the existence of fraudulent intent").

[148] *Tow*, 2015 WL 1058080, at *11.

evidence to create a genuine issue of material fact that necessitates denial of summary judgment. The Trustee claims to have "direct evidence" of fraudulent intent in Harris's/ABRE's Rule 30(b)(6) deposition and Adele Wang's deposition testimony. ABRE argues that the Trustee mischaracterizes their testimony regarding ABRE's intent in transferring the Three ABRE Properties and that ABRE has pointed to evidence in the record that Debtor Fire Mountain (and OCB Restaurant) actually had a genuine business reason for transferring the real estate out of the operating entities—such that there is a genuine issue of material fact on the actual fraud intent issue. The Trustee also claims to have pointed to evidence in the record to establish a sufficient number of badges of fraud to create an inference, as a matter of law, that Debtors Fire Mountain and OCB Restaurant transferred the Three ABRE Properties to ABRE with intent to hinder, delay, or defraud their creditors and that of the "[m]ultiple badges of fraud [that] exist here, most [are] uncontested and all [are] uncontestable," thus shifting the burden of disproving fraud to ABRE."[149] The Trustee identifies the following badges of fraud that he alleges exist here:

- ABRE was an insider of the Debtors;
- The Owners/Debtors retained possession and control over the Reelfoot Tennessee Property;
- The purpose of the Transfer was to conceal the existence of the assets from the Debtors' creditors when the Debtors filed bankruptcy;
- The Debtors were constantly operating under pressure from creditors and considering bankruptcy;
- The Reelfoot Tennessee Property and the Highway 28 South Carolina Property were Fire Mountain's only tangible assets when they were transferred to ABRE;

---

[149] Trustee's MPSJ Brief, 17. The Trustee asserts that the "presence of one or more badges gives rise to a presumption of fraud and shifts the burden of disproving fraud to the defendant." In support, the Trustee cites to two cases that are in the Fifth Circuit/Texas: *Faulkner v. Kornman (In re The Heritage Org., L.L.C.)*, 413 B.R. 438, 466 (Bankr. N.D. Tex. 2009) and *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008). But, neither of these cases state that the burden shifts if the Trustee shows just one badge of fraud. The bankruptcy court in *In re Heritage*, for example, expressly states that the burden shift only occurs if "several" badges are shown. 413 B.R. at 466 ("If the Trustee establishes the existence of several badges of fraud by a preponderance of the evidence, the Defendants will bear the burden of persuasion on any 'legitimate supervening purpose'" for each of the Transfers). The Fifth Circuit in *In re Soza* similarly implied a burden shift in noting that when "several" badges are present, it can be a basis for a "inference of fraud." ABRE argues that, even if the Trustee could shift the burden to ABRE, it has "rebutted any such presumption with evidence that there was no fraudulent intent ***and raised at least a genuine issue of material fact on every badge of fraud other than ABRE's status as an insider such that summary judgment is inappropriate***." ABRE's Response, 39 n.43 (emphasis added).

- "The entire purpose of the transfers to ABRE was to remove or conceal the assets from the Debtors' creditors, again as shown by the rapid sale of one of those properties (Reelfoot Avenue) by ABRE to a third party—if this were not the motivation, then that property would have simply been sold by Fire Mountain directly;"
- There was no consideration paid to Fire Mountain, let alone reasonable consideration; and
- Fire Mountain was insolvent at the time of the December 2018 transfers.[150]

ABRE responds that its insider status is uncontested; all other badges of fraud are, in fact, contested in that ABRE has "*raised at least a genuine issue of material fact on every badge of fraud other than ABRE's status as an insider such that summary judgment is inappropriate.*"[151] Moreover, the court has already found that there is a genuine issue of material fact as to the insolvency badge of fraud and the "less than reasonably equivalent value" badge of fraud.

The court can easily conclude that neither of the parties are entitled to summary judgment on the badges of fraud that the Trustee has alleged to support an inference of actual intent on Debtor Fire Mountain's part to hinder, delay, or defraud its creditors in transferring the Reelfoot Tennessee Property. Thus, this is further reason to deny both parties' motions for summary judgment as to the Trustee's actual fraud claims under TUFTA.

### 2. *Conspiracy to Commit Fraudulent Transfers against Sole Defendant, ABRE*

ABRE seeks a summary judgment on the Trustee's conspiracy to commit fraudulent transfer claim.[152] ABRE argues that it is entitled to summary judgment on the Trustee's conspiracy to commit fraudulent transfer claim because the Trustee (1) has failed to present evidence of the underlying tort (i.e., a fraudulent transfer) and, therefore, he cannot succeed on a claim for civil conspiracy, (2) has failed to meet his summary judgment burden of pointing to sufficient evidence

---

[150] Trustee's MPSJ Brief, 17-18. The court notes that the Trustee, again, cites to the one page (39) of the Kotzin Report as his evidence that Debtor Fire Mountain was insolvent at the time of the transfers.

[151] ABRE's Response, 39 n.44; *see also supra* note 149.

[152] The Trustee did not seek a summary judgment on his conspiracy to commit fraudulent transfer claim in his Motion for Partial Summary Judgment.

in the record to support each element of a civil conspiracy claim, and (3) the civil conspiracy claim is redundant of the underlying fraudulent transfer claim.

Before the court addresses ABRE's substantive bases for summary judgment as to this claim, the court raises the much-debated issue of whether Texas law even recognizes a separate and independent claim for conspiracy to commit a fraudulent transfer under TUFTA. This is one of the issues on which the court sought post-hearing briefing. ABRE provided post-hearing briefing on this issue;[153] the Trustee, whose burden it would be to establish that such a cause of action exists under Texas law, did not.[154]

ABRE acknowledges that there is a split of authority in the Fifth Circuit regarding whether, and to what extent, and against which defendants, Texas recognizes a claim for conspiracy to commit a fraudulent transfer under TUFTA.[155] All of the cited cases address whether a defendant, who is not directly liable under TUFTA's fraudulent transfer provisions, can be indirectly, or secondarily, liable based on a theory that the defendant conspired with the primary tortfeasor to commit the underlying tort. Here—somewhat nonsensically—the Trustee is attempting to hold the *sole defendant*, ABRE, primarily liable under TUFTA for the alleged fraudulent transfer of the Reelfoot Tennessee Property, and secondarily liable under a civil conspiracy theory of liability for

---

[153] ABRE Supplemental Brief, 23-24.

[154] *See* Trustee's Supplemental Brief, 24 (where the Trustee provided one non-responsive sentence regarding this issue: "Consistent with the analysis set out in Section 1 of this brief, the law of Texas applies to the Trustee's Civil Conspiracy claims.").

[155] *See* ABRE Supplemental Brief, 23 (comparing *In re Silver State Holdings, Assignee-7901 Boulevard 26 LLC,* No. 19-41579-MXM, 2020 WL 7414434, at *31 (Bankr. N.D. Tex. Dec. 17, 2020), *subsequently aff'd sub nom. Matter of Silver State Holdings, Assignee 7901 Boulevard 26, L.L.C.*, No. 21-10212, 2022 WL 3755778 (5th Cir. Aug. 30, 2022) ("The Court agrees with the thorough analysis in *Official Stanford Investors Comm. v. Traurig*, where the District Court for the Northern District of Texas concluded that Texas law does not provide for secondary liability for fraudulent transfers through conspiracy, aiding and abetting, and similar secondary-liability theories.") with *Bramante v. McClain, Sr.,* No. CIVA SA-06-CA-0010 O, 2007 WL 4555943, at *7 (W.D. Tex. Dec. 18, 2007) ("Although few Texas cases consider claims involving a conspiracy to make fraudulent transfers, sufficient case law exists to support the plaintiffs' conspiracy claim.") and *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 743 (Bankr. S.D. Tex. 2020) ("NGP Energy's claims that the Texas law does not provide for causes of action for conspiracy or aiding and abetting to commit fraudulent transfers fail.").

the very same tort. The Trustee has not pointed to any legal authority that recognizes an independent and separate claim for conspiracy to commit a fraudulent transfer under such circumstances.

The court need not decide whether Texas might recognize a claim for civil conspiracy to commit a fraudulent transfer under different facts because Texas would not recognize a claim for conspiracy to commit a fraudulent transfer under *these* facts. It is essentially a recognition that a claim for conspiracy to commit a fraudulent transfer, when brought against a single defendant who is also alleged to be primarily liable under TUFTA for the underlying fraudulent transfer, is redundant.[156] ABRE is entitled to a summary judgment on the Trustee's conspiracy to commit fraudulent transfer claim because it is redundant, and Texas does not recognize an independent claim for conspiracy to commit a fraudulent transfer under TUFTA when asserted against a single defendant who is alleged to have been primarily liable for the underlying fraudulent transfer.[157] Accordingly, the court will not address ABRE's arguments that the Trustee has failed to point to evidence of the underlying tort and has otherwise failed to present evidence that supports each element of a civil conspiracy claim under Texas law.

---

[156] ABRE argues in Reply that the Trustee's claim for conspiracy is redundant because, under Texas law, "[c]ivil conspiracy is a type of participatory liability used to establish joint and several liability for those who participate in an agreement to commit a tort; it is simply a way to *extend* liability beyond the primary actor to others who agreed to act toward a common goal." ABRE'S Reply, 28 (citing *Agar Corp. v. Electro Circuits Int'l*, 580 S.W. 3d 136, 140-142 (Tex. 2019); *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W. 2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cty., Inc.*, 393 S.W. 3d 492, 506 (Tex. App.–Dallas 2013, pet. denied)). As ABRE points out, a plaintiff is only permitted to recover on a claim of conspiracy the actual damages available for the underlying tort. A plaintiff is not entitled to an award of additional damages based solely on the conspiracy claim because conspiracy is not an independent basis for liability under Texas law. *See* ABRE'S Reply, 28 (citing *Tilton v. Marshall*, 925 S.W. 2d 672, 681 (Tex. 1996); *Bramante v. McClain, Sr.*, No. CIVA SA-06-CA-0010 O, 2007 WL 4555943, at *7 (W.D. Tex. Dec. 18, 2007) (in claim for conspiracy to commit fraudulent transfer, finding no legal authority under Texas law "supporting liability beyond the amounts actually transferred"); *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W. 2d 922, 925 (Tex. 1979); *Schlumberger Well Surv. Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 856-57 (Tex. 1968); *Hart v. Moore*, 952 S.W. 2d 90, 98 (Tex. App. – Amarillo 1997, pet. Denied)).

[157] *See Tummel v. Milane*, 787 F. App'x 226, 227 (5th Cir. 2019) (noting that "[t]he Supreme Court of Texas has . . . clarified [that] 'civil conspiracy is a theory of vicarious liability and not an independent tort.'") (quoting *Agar*, 580 S.W.3d at 140-42).

For the reasons set forth above,

**IT IS ORDERED** that the Trustee's Motion for Partial Summary Judgment, be, and hereby is, **DENIED**;

**IT IS FURTHER ORDERED** that ABRE's Motion for Summary Judgment be, and hereby is, **DENIED** with respect to the Trustee's fraudulent transfer claims under TUFTA, and **GRANTED**[158] with respect to the Trustee's conspiracy to commit fraudulent transfer claim.

### ###END OF MEMORANDUM OPINION AND ORDER###

---

[158] To the extent that the disposal herein of the civil conspiracy count should have been presented to the District Court in the form of a Report & Recommendation, this court respectfully requests that, in any future appeal, the District Court treat the bankruptcy court's granting of summary judgment—which disallows the civil conspiracy claim—as a ***proposal*** that should be reviewed entirely de novo.  *See* 28 U.S.C. § 157(c)(1).